447 S.E.2d 901

STATE of West Virginia ex rel. Diana LAMBERT, By Her Next Friends, Kathleen LAMBERT and Hobert Lambert, Petitioners,

v.

The WEST VIRGINIA STATE BOARD OF EDUCATION, a Corporation, and The West Virginia Secondary Schools Activities Commission, a Corporation, Respondents.

No. 22225.

Supreme Court of Appeals of West Virginia.

Submitted June 28, 1994.

Decided July 20, 1994.

Daniel F. Hedges, Charleston, for petitioners.

John S. Dalporto, Asst. Atty. Gen., Charleston, for respondent West Virginia State Bd. of Educ.

William R. Wooton, Wooton, Wooton & Fragile, Beckley, for respondent West Virginia Secondary Schools Activities Com'n.

WORKMAN, Justice:

In this original proceeding, the Petitioners, Diana Lambert and her parents, Kathleen and Hobert Lambert, seek a writ of mandamus against the Respondents, the West Virginia State Board of Education (hereinafter referred to as the Board) and the West Virginia Secondary School Activities Commission (hereinafter referred to as the SSAC), 1) to compel the Board to exercise the general supervisory authority it has pursuant to Article XII, § 2 of the West Virginia Constitu-

tion[1] over extracurricular athletic and band activities, and to declare West Virginia Code § 18–2–25 (1994) unconstitutional in that the statute attempts to divest or transfer the Board's constitutional general supervisory authority to the county boards of education and the SSAC; 2) to order the Lincoln County Board of Education to provide Diana Lambert, a deaf student at Guyan Valley High School in Lincoln County, West Virginia, with a signer so that she may participate in the extracurricular activity of basketball during the 1994–95 school year; and 3) to order that girls be permitted to schedule their extracurricular basketball activities within the traditional normal winter basketball season in which boys' basketball is played and further order that the girls be afforded equal access with the boys to appropriate facilities in the public schools for basketball practice and games. Based upon the parties' briefs and arguments, the record and all other matters submitted before this Court,[2] we grant the writ sought by the Petitioners with regard to the signer and the girls' basketball season; however, we deny the writ as it relates to the constitutionality of West Virginia Code § 18–2–25. Because the Petitioners raise three separate and distinct issues in their petition, we address each issue separately.

## REQUEST FOR SIGNER

Diana Lambert is an eleventh-grade student at Guyan Valley High School in Branchland, Lincoln County, West Virginia. She has been deaf since birth and has a signer for her basic courses, but is not provided a sig-

ner for her vocational classes[3] or her extracurricular activities.

Ms. Lambert has participated in school athletics since sixth grade, and played for the Guyan Valley High School's girls' basketball team during her freshman and sophomore years without a signer. Ms. Lambert's coach, Jim Nelson, stated in an affidavit, dated May, 31, 1994, that he knew of her disability prior to when she started high school and he took several steps in order to meet her special needs, including obtaining assistance from a student speech pathologist so that he would know how to effectively communicate with her. Ms. Lambert's father also frequently attended practices and on occasion would interpret for his daughter.

In October 1993, during her junior year, Mr. Lambert suggested to Coach Nelson that a signer might be of assistance to his daughter because she was having trouble understanding the coach's directions. During that same month, Coach Nelson spoke with Mr. Doug Smith, Director of Special Education for Lincoln County, about the possibility of a signer for Ms. Lambert, and informed Mr. Smith that Mr. and Mrs. Lambert were going to make a request for a signer for their daughter. On October 19, 1993, Ms. Lambert's principal, Paul "Skip" Winters, received a request from Mr. Lambert for a signer. Mr. Winters referred Mr. Lambert to Mr. Smith. Neither Ms. Lambert nor her parents ever contacted Mr. Smith. Ms. Lambert was never provided with a signer. She was dismissed from the basketball team by Coach Nelson just prior to post-season tournament play at the end of the season.[4]

1. It is significant to note that the Board originally failed to take a position on the issues in the present case. This Court, by order dated June 13, 1994, ordered the Board's participation.

2. Amicus curiae briefs submitted by the West Virginia Women's Commission and the West Virginia Human Rights Commission were considered by this Court in rendering its decision.

3. The record before us reflects no request by the Petitioners that Ms. Lambert be provided a signer for her vocational courses and therefore, we do not address this potential issue.

4. There is a factual dispute as to why Ms. Lambert was dismissed from the basketball team. The Petitioners maintain that the dismissal was

due to her disability in that she could not understand the coach's directions. In contrast, the Respondents assert that Ms. Lambert's dismissal stemmed from a reduction in playing time due to injuries she had sustained, which ultimately resulted in Ms. Lambert engaging in misconduct due to her frustration. Coach Nelson disciplined her for the misconduct, which resulted in Ms. Lambert's dismissal from the team. However, the fact remains, that regardless of why Ms. Lambert was dismissed from the team, she did request the assistance of a signer for basketball practices and games. Furthermore, Coach Nelson subsequently informed Ms. Lambert that she could play on the team during her senior year.

In December 1993, according to Petitioners' brief, the Petitioners' counsel stated that he approached Mr. Smith about the Petitioners' request for a signer, and was informed that Ms. Lambert would not be afforded a signer. By letter dated March 24, 1994, the Petitioners' counsel inquired of Dr. Henry R. Marockie, State Superintendent of Schools, as to why Ms. Lambert had not been afforded a signer. Dr. Marockie first responded to the Petitioners' counsel's inquiry by letter dated April 1, 1994, that "Diana Lambert does appear to be entitled to a signer or some assistance from the Lincoln County Board of Education for ... extracurricular courses[,]" Dr. Marockie also stated that "her [Ms. Lambert's] claim is outside my jurisdiction[,]" and that the SSAC should be contacted for a remedy. However, by letter dated April 6, 1994, from Victor A. Barone, Director of Legal Services for the West Virginia Department of Education, to Ms. Jan Pannett, Assistant Secretary of the SSAC, Mr. Barone indicated that he had advised the Petitioners' counsel that he was not sure that the Petitioners' claim was outside the Board's jurisdiction and that he was requesting that the Lincoln County Superintendent look into the matter.

The Individuals with Disabilities Education Act, 20 U.S.C. §§ 1400 to 1485 (1989 and Supp.1994) (hereinafter referred to as the "IDEA"), requires certain types of support services and accommodations for handicapped students and children with special needs, and also charges state educational agencies with the full responsibility for implementing regulations for handicapped students. *See* 20 U.S.C. § 1412(6); *see generally Zobrest v. Catalina Foothills Sch. Dist.*, — U.S. —, —, 113 S.Ct. 2462, 2469, 125 L.Ed.2d 1, 14 (1993) (stating that "[t]he IDEA creates a neutral government program dispensing aid not to schools but to individual handicapped children."). The IDEA, implemented by the code of federal regulations, specifically provides that "[e]ach public agency [5] shall take steps to provide nonacademic and extracurricular services and activities in such manner as is necessary to afford children with disabilities [6] an equal opportunity for participation in those services and activities." 34 C.F.R. § 300.306(a) (1993) (footnotes added). Additionally, the Rehabilitation Act of 1973, 29 U.S.C. §§ 701 to 797b (1985 and Supp.1994), as implemented by 34 C.F.R. § 104.37 (1993), provides that

(a) *General.* (1) A recipient [7] to which this subpart applies shall provide nonacademic and extracurricular services and activities in such manner as is necessary to afford handicapped students an equal opportunity for participation in such services and activities.

(2) Nonacademic and extracurricular services and activities may include ... physical recreational athletics....

....

(c) *Physical education and athletics.* (1) In providing physical education courses and athletics and similar programs and activities to any of its students, a recipient to which this subpart applies may not discriminate on the basis of handicap. A recipient that offers physical education courses or that operates or sponsors interscholastic, club, or intramural athletics shall provide to qualified handicapped students an equal opportunity for participation in these activities.

34 C.F.R. § 104.37(a) and (c)(1) (footnote added); *see generally* 42 U.S.C. §§ 12101 to 12213 (Supp.1994) (Americans with Disabilities Act of 1990).

The SSAC conceded and the Board acknowledged that the Board has full responsi-

5. Public agency includes individualized education program, local educational agency, state educational agency, and "any other political subdivisions of the State that are responsible for providing education to children with disabilities." 34 C.F.R. § 300.14.

6. Children with disabilities includes a child with deafness or a hearing impairment. *See* 34 C.F.R. § 300.7 (1993).

7. A "recipient" is defined as "any state or its political subdivision, any instrumentality of a state or its political subdivision, any public or private agency, institution, organization, or other entity, or any person to which Federal financial assistance is extended directly or through another recipient, including any successor, assignee, or transferee of a recipient...." 34 C.F.R. § 104.3(f) (1993).

bility for implementing these federal statutes as well as the state statutes dealing with disabled individuals.[8] *See* W.Va.Code §§ 5–11–1 to –19 (1994 and Supp.1994) (West Virginia Human Rights Act prohibiting discrimination based upon handicap in places of public accommodation); *see generally* 6 W.Va. C.S.R. §§ 77–1–4.4 to –4.5 (West Virginia Human Rights Commission's rules regarding discrimination in employment arena against handicapped). Indeed, the Board has promulgated the following policies pertaining to individuals with disabilities: "If you are handicapped ... and in need of special education and related services, your parents or guardian should contact the county's Director of Special Education[,]" and "As a student, you may not be denied the right to participate in extracurricular activities because of your ... disability...." State Board Policy 4372, Student Handbook of Rights and Responsibilities, §§ II and IV. Further, State Board Policy 4200 includes the following provision: "Members of both sexes, regardless of their race, color, religion, handicapping condition, age or national origin, must be granted equal access to extracurricular activities." 9 W.Va.C.S.R. § 126–82–3.4.

In the present case, the Board and the SSAC agree that if Ms. Lambert "effectively requested the assistance of a signer," "upon request and investigation, [if] the assistance of a signer is deemed a reasonable accommodation, necessary to provide the student with equal access to extracurricular activities, then she is entitled to such assistance." The Respondents rely heavily on their contention that Ms. Lambert's parents never officially requested a signer from the Lincoln County Director of Special Education. Thus, the Respondents continue to assert the position that a request was never made to provide a signer for Ms. Lambert during extracurricular activities, and accordingly a signer was never provided. However, the Respondents inexplicably refuse to acknowledge that Mr. Lambert made requests of Coach Nelson and

Mr. Winters, Ms. Lambert's principal, to provide his daughter with a signer. Further, affidavits submitted by the SSAC indicate that Coach Nelson spoke with Mr. Smith regarding Mr. Lambert's request. Finally, the Petitioners' counsel spoke with not only Mr. Smith, but also with Dr. Marockie about the Petitioners' request for a signer.

Given that all these requests were made to various representatives of both the county board of education and the Board, the Respondents continue to predicate their duty to provide Ms. Lambert with a signer for the upcoming 1994–95 basketball season on an "effective" request being made by Ms. Lambert's parents to Mr. Smith.[9] The Respondents' position is unpersuasive and seemingly based neither in the law, nor in basic common sense, but in bureaucratic red tape. It is understandable that a disabled individual's request must be processed by the director of special education within a county so that services can be investigated and coordinated; but it is incomprehensible why that request can only be made by the parent to the director of special education, especially where the director learns of the request. It is apparent that oftentimes, as in the present case, a parent will request assistance in obtaining services for a disabled child from a principal, teacher, or coach. It is also logical that each of these individuals may be more familiar with the student's needs, and better able to explain the necessity for the special assistance with a director of special education than the parent. Finally, while the policy in the student's handbook provides that requests for services for handicapped individuals must be made by the parent, no other provision contained within either state or federal statutes or regulations imposes such a requirement on these requests. *See* State Board Policy 4372, *supra*, at § II.

■ Accordingly, we hold that when a student has a disability requiring special assistance or services to enable participation in school-sanctioned extracurricular activities, a

---

**8.** The Board indicates that even though it is the Board's responsibility to promulgate these policies and to supervise their implementation, it is the county board of education's responsibility to handle the requests for services by a handicapped student, and to provide said services.

**9.** It is fairly incredible that even after this petition was brought in the West Virginia Supreme Court of Appeals, the Respondents continued to recognize no "effective" request.

request for assistance or services can be made on the student's behalf to any school official familiar with the student's needs. That school official then has the responsibility to inform the county board of education's director of special education of the request so that appropriate action can be taken.

■ In the present case, we conclude that both direct and indirect requests were made of several different school officials that Ms. Lambert be provided with a signer for the upcoming basketball season. Further, since the Lincoln County Board of Education has already determined that Ms. Lambert needs a signer for her basic academic classes, there would generally be no necessity for the Board to further investigate her request for a signer for extracurricular activities as well. Therefore, we direct the Lincoln County Board of Education to provide her with a signer for her school-sanctioned extracurricular activity of basketball.

## GIRLS' BASKETBALL SEASON

■ The Petitioners next contend that the directives of the SSAC, which not only require that the girls play their basketball games outside the traditional basketball season rather than during the traditional bas-

ketball season,[10] but also limit the girls' organized practices to half the time allotted to boys,[11] discriminate against girls on the basis of their gender in violation of Article III, § 10 of the West Virginia Constitution[12] and the West Virginia Human Rights Act, West Virginia Code §§ 5–11–1 to –19 (1994).[13] The SSAC, in its brief, contends that while it is the Board's decision as to when the girls' basketball season is played, seasonal placement alone is not dispositive of the question of whether female athletes have been denied equal protection under the law.[14]

We gave the Board an opportunity to present us with any information which would justify the continuation of the current scheduling system, such as facility limitations, personnel or financial constraints, or other obstacles. However, the Board provided no such information, nor did they enunciate any compelling governmental objective which might be served by the current system. In fact, the Board, when it finally took a position, agreed with the Petitioners that the girls' basketball season should be changed to coincide with the traditional basketball season, and merely requested that this Court allow them a year to implement the schedul-

10. West Virginia is only one of five states which schedules girls' basketball during the fall rather than the winter.

11. The girls have two weeks of organized practice, while boys have four weeks of organized practice.

12. Article III, § 10 of the West Virginia Constitution provides that "[n]o person shall be deprived of life, liberty, or property, without due process of law, and the judgment of his peers." This Court in syllabus point 4 of *Israel ex rel. Israel v. West Virginia Secondary Schools Activities Commission*, 182 W.Va. 454, 388 S.E.2d 480 (1989), held that "West Virginia's constitutional equal protection principle is a part of the Due Process Clause found in Article III, Section 10 of the West Virginia Constitution."

13. We resolve this issue under the equal protection claim, finding that the girls' basketball season as it currently exists is unconstitutional gender-based discrimination. However, it is clear that the West Virginia Human Rights Act also guarantees "equal access to places of public accommodations" to all individuals regardless of "race, religion, color, national origin, ancestry,

sex, age, blindness or handicap." W.Va.Code § 5–11–2. This Court in *Israel* found that for the purposes of the Act, the SSAC is a "place of public accommodations." 182 W.Va. at 463, 388 S.E.2d at 489. Further, in syllabus point 2 of *Board of Education v. West Virginia Human Rights Commission*, 182 W.Va. 41, 385 S.E.2d 637 (1989), we held that a county board of education was not only considered a " 'place of public accommodations,' " but that it "may not discriminate against the handicapped in violation of *W.Va.Code*, 5–11–9(f), as amended." *See* 6 W.Va.C.S.R. § 77–1–7.2 and –7.4.

14. The SSAC also argues that the issue concerning the constitutionality of the placement of the girls' basketball season is now moot since the Board has voted to change the season from the fall to the winter. We disagree; the issue has not been fully resolved since, without a court order, the Board may at any time change their policy, and revert the girls' basketball season back to the fall, or decide not to implement the new policy at all. *See also* Syl. Pt. 1, *Israel*, 182 W.Va. at 455, 388 S.E.2d at 481 ("while technically moot in the immediate context, questions of great public interest may nevertheless be addressed for the future guidance of the bar and of the public").

ing change. The Board took no position on the constitutionality of the scheduling. However, state rules promulgated by the Board relating to equal opportunities in West Virginia public schools in the area of extracurricular activities expressly mandate equal access to extracurricular activities for both sexes. *See* 9 W.Va.C.S.R. § 126–82–3.4 to –3.5.2; *see also* State Board Policy 4372, *supra,* at § IV.

The Petitioners' argument is premised upon a letter dated March 22, 1992, from Dr. Marockie to Mr. Warren Carter, Executive Secretary of the SSAC, which indicated that "[t]he Board wants to have a definitive study completed on the impact of changing [the girls' basketball season] from fall to winter. They [the Board] directed that Dr. Keith Smith work with the SSAC to complete and bring to the Board the information on the movement of the girls season from fall to winter." Further, the Board, in requesting such study, indicated that it was interested in "shifting the season from fall to winter." A study was undertaken by the SSAC, but after the study was completed, the Board did not take a position on changing the season, and the SSAC maintained the status quo. It was not until after the Court ordered the Board to take a position on the scheduling of the girls' basketball season, that the Board conducted a special meeting on June 16, 1994, and adopted a motion stating "(1) that girls' basketball should be played within the normal winter basketball season in which boys' basketball is played, and (2) that the board develop, by November, 1994, a plan for implementing this change."

■ This Court addressed the issue of whether gender-based discrimination in public school sports violated the equal protection clause under the West Virginia Constitution in *Israel ex rel. Israel v. West Virginia Secondary Schools Activities Commission,* 182 W.Va. 454, 388 S.E.2d 480 (1989). In *Israel,* a female high school student brought a gender discrimination claim against the secondary school activities commission and the county board of. education after she was refused the opportunity to play on the boys' high school baseball team because her high school had a girls' softball team. *Id.* at 456,

388 S.E.2d at 482. We held that "[e]qual protection of the law is implicated when a classification treats similarly situated persons in a disadvantageous manner." *Id.* at 455, 388 S.E.2d at 481, Syl. Pt. 2, in part. Further, "[a] gender-based classification challenged as denying equal protection under Article III, Section 10 of the West Virginia Constitution can be upheld only if the classification serves an important governmental objective and is substantially related to the achievement of that objective." *Id.,* Syl. Pt. 5, in part.

Even though we recognized in *Israel* that other "courts have recognized that it is constitutionally permissible under certain circumstances for public schools to maintain separate sports teams for males and females so long as they are substantially equivalent[,]" we also stated that "this does not mean that mere superficial equivalency will be found constitutional under equal protection principles." *Id.* at 458, 459, 388 S.E.2d at 484, 485. We then examined the similarities and differences between baseball and softball before reaching the conclusion that the two sports were not substantially equivalent. *Id.* at 459, 388 S.E.2d at 485. We concluded that the regulation which prohibited a female student from playing on the boys' baseball team as long as the school maintained a girls' softball team violated federal and state constitutional equal protection standards. *Id.* at 462, 388 S.E.2d at 488.

■ Guided by the principles enunciated in *Israel,* we examine the scheduling of girls' basketball in the nontraditional season, as opposed to the traditional scheduling when girls' basketball is scheduled in a majority of the states, along with boys' basketball and men's and women's college basketball, and professional basketball. The scheduling of girls' high school athletics in a manner which is counter-conventional creates significant disadvantages for female athletes which are not shared by male athletes. These disadvantages include effective exclusion from interstate competition and tournaments, since surrounding states including Pennsylvania,

Ohio, Kentucky, Maryland and Virginia,[15] schedule girls' basketball in the winter. Also, female basketball players are more often at a disadvantage with regard to college recruiter access.[16] Further, female basketball players are afforded access to gyms for organized practices for only two weeks during hot summer months, as opposed to the four weeks of organized practice time afforded male basketball players during the late fall and winter months. Finally, because the girls currently do not play during the traditional season, they do not reap the benefits which normally come with the traditional season, including greater interest in basketball by the public, media and college recruiters. Perhaps more compelling than any unfairness to actual female basketball players is the message this scenario conveys to girls in general, that girls' sports are second-class, that boys take priority as to use of sports facilities and resources, and girls take the leavings. Hence, the message conveyed to young girls in this state is that they are not as important as the boys.

Therefore, we conclude that the scheduling of girls' basketball in the nontraditional season, as well as the access to organized practice time afforded to girls' basketball teams constitute a "mere superficial equivalency." *Israel*, 182 W.Va. at 459, 388 S.E.2d at 485.

Since the scheduling of the girls' high school basketball season outside the time period traditionally observed as the official basketball season serves no important governmental objective, it is unconstitutional as it violates the equal protection clause set forth in Article III, § 10 of the West Virginia Constitution. We hereby direct the Board to submit to this Court by November 1, 1994, its plan to change the girls' basketball season to the winter beginning with the 1995–96 school year.

## CONSTITUTIONALITY OF SSAC

■ Finally, we address whether West Virginia Code § 18–2–25 which establishes the SSAC and grants authority to county boards of education to control, supervise and regulate all interscholastic athletic events, and other extracurricular activities in the secondary school system violates Article XII, § 2 of the West Virginia Constitution, which establishes the Board's general supervisory powers over the schools of this state. The Petitioners contend that West Virginia Code § 18–2–25 is unconstitutional in that it effectively transfers the Board's constitutional duty to supervise the school system to the SSAC and county boards of education. *See* W.Va. Const. art. XII, § 2.[17] In contrast,

---

15. In Virginia, girls' basketball is set up under a two-tier system, with teams from schools with less than 1,000 students enrolled playing in the fall and those with greater than 1,000 students enrolled playing in the winter.

16. The SSAC submitted the affidavits of Paul Flores, California University girls' basketball coach, and David Gaudino, Director of the West Virginia Girls' Basketball Poll and the assistant coach for John Marshall High School, who both indicated that a change of the girls' basketball season from the fall to the winter would be detrimental to female athletes. However, there was also an affidavit submitted by Sarah Leigh Evans–Moore, the head coach for women's basketball at Marshall University, who indicated that under the present scheduling, girls in this state are at a disadvantage when it comes to recruiting by Division I women's college basketball programs due to the fall schedule.

17. As part of their constitutional argument, the Petitioners assert that the SSAC is improperly composed of only males. Specifically, the Petitioners argue that the SSAC's twenty-nine officers are all male. The Petitioners further stated in oral argument that the SSAC was a closed

group with essentially a self-selection system. West Virginia Code § 18–2–25 does establish a membership system which is sex-neutral on its face, by providing that the SSAC "shall be composed of the principals, or their representatives" of those county boards of education which have delegated the supervision of extracurricular activities to the SSAC. *See* 9 W.Va.C.S.R. §§ 127–1–4 to –1–6 and –1–8. Further, the SSAC maintains that it presently has two female officers and twenty-seven male officers.

Additionally, while the West Virginia Code of State Regulations provides that "[t]o be eligible for participation in interscholastic athletics a student must be enrolled in a member school on or before the eleventh instructional day of the semester in which he competes[,]" the term "member school" is not defined. 9 W.Va.C.S.R. § 127–2–3.1. The Respondent Board represented to the Court during oral argument not only that secondary schools did not have to be a member of the SSAC to participate in interscholastic sports, but also that the SSAC was going to stop collecting dues charged for membership in the SSAC.

Finally, since, according to the Respondent SSAC's brief, approximately 50% of the students

the Respondents argue that West Virginia Code § 18–2–25 does not divest the Board of its constitutional duty to generally supervise the state schools. Further, the Respondents assert that the statute does not delegate any authority to the SSAC nor does it vest exclusive authority in county boards of education with respect to the regulation of extracurricular activities as recognized by the Court in *Bailey v. Truby,* 174 W.Va. 8, 321 S.E.2d 302 (1984). The Respondent Board took this position only after this Court ordered it do so. The SSAC in essence acknowledges that it is under the direction of the Board with respect to its constitutionally mandated responsibilities.

Article XII, § 2 of the West Virginia Constitution mandates that "[t]he general supervision of the free schools of the State shall be vested in the West Virginia board of education which shall perform such duties as may be prescribed by law." In conformity with this constitutional mandate, West Virginia Code § 18–2–5 (1994) provides:

Subject to and in conformity with the constitution and laws of this state, the state board of education shall exercise general supervision of the public schools of the state, and shall make rules in accordance with the provisions of article three-b [§ 29A–3B–1 et seq.], chapter twenty-nine-a of this code for carrying into effect the laws and policies of the state relating to education, including rules relating to standards for performance and measures of accountability, the physical welfare of pupils, the education of all children of school age, school attendance, evening and continuation or part-time day schools, school extension work, the classification of schools, the issuing of certificates upon credentials, the distribution and care of free textbooks by the county boards of education, the general powers and duties of county boards of education, and of teachers, principals, supervisors and superintendents, and such other matters pertaining to the public schools of the state as may seem to the state board to be necessary and expedient.

The Petitioners argue that West Virginia Code § 18–2–25 allows county boards of education and the SSAC to usurp the Board's constitutional and statutory duty to generally supervise the schools. That statute provides, in pertinent part:

The county boards of education are hereby granted and shall exercise the control, supervision and regulation of all interscholastic athletic events, and other extracurricular activities of the students in public secondary schools, and of said schools of their respective counties. The county board of education may delegate such control, supervision and regulation of interscholastic athletic events and band activities to the 'West Virginia secondary school activities commission,' which is hereby established.

... The West Virginia secondary school activities commission is hereby empowered to exercise the control, supervision and regulation of interscholastic athletic events and band activities of secondary schools, delegated to it pursuant to this section. *The rules and regulations of the West Virginia secondary school activities commission ... shall, ... in all instances be subject to the prior approval of the state board.*

W.Va.Code § 18–2–25 (emphasis added).

The Petitioners' argument is flawed for several reasons. The Petitioners fail to acknowledge the existence of language in West Virginia Code § 18–2–5 which specifically provides that the Board "shall exercise general supervision of the public schools of the state, and shall make rules ... for carrying into effect the laws of policies of the state relating to education, including ... the general powers and duties of county boards of education...." The Petitioners also fail to acknowledge the significance of the following provision of West Virginia Code § 18–2–25: "The rules and regulations of the West Virginia secondary school activities commission ... shall ... in all instances be subject to the prior approval of the state board." *See*

---

in West Virginia's secondary schools are female, and since many of those female students participate in extracurricular activities governed by the

SSAC, it would certainly behoove the SSAC to seek greater female representation in its management and decision making.

*also* W.Va.Code § 18–5–13 (1994) (setting forth authority of school boards). To overlook these statutory provisions is to disregard the clear intent of the Legislature that the ultimate control over the county boards of education, as well as the SSAC, rests with the Board.

Additionally, the Petitioners failed to properly analyze this Court's decision in *Bailey*, where we indirectly addressed the constitutionality of West Virginia Code § 18–2–25. 174 W.Va. at 8, 321 S.E.2d at 302. In *Bailey*, we consolidated two actions concerning the validity of academic eligibility requirements for participation in extracurricular activities. In the first action, the Wood County Board of Education sought a writ of mandamus to compel the state board to withdraw a rule requiring students to maintain a "C" grade point average in order to participate in extracurricular activities. The second action was an appeal by a high school student from a denial of injunctive relief sought to prohibit the Kanawha County Board of Education rule requiring students to receive passing grades in all of their classes, in addition to the requirement that they maintain a 2.0 grade point average, in order to participate in extracurricular activities. *Id.* at 11, 321 S.E.2d at 305.

The petitioners in *Bailey* contended that "the Legislature, in enacting West Virginia Code § 18–2–25 ... intended to vest exclusive authority in county boards of education with respect to the regulation of extracurricular activities." *Id.* at 16, 321 S.E.2d at 310. In rejecting the petitioners' argument, we stated that "[f]irst, such a result does not appear to be what the Legislature intended. Second, even if such a result was intended by the Legislature, it must fail to the extent that it interferes with the State Board of Education's exercise of general supervision over our state's educational system." *Id.*

We then discussed several factors which indicated to us that the Legislature did not intend to vest exclusive control over extra-curricular activities with the county boards of education.[18] *Id.* at 17, 321 S.E.2d at 311. First, West Virginia Code § 18–2–25 is not located in the article of the code dealing with the structure and function of county boards of education, but rather is located within the article pertaining to the state board. *Id.* Thus, we concluded that "the Legislature assumed that, prior to the enactment of West Virginia Code § 18–2–25 ... exclusive control of extracurricular activities vested in the State Board of Education." *Id.* Second, we referenced not only the portion of West Virginia Code § 18–2–25 which created the secondary school activities commission, but also the portion of the statute which gives the state board final approval over all rules and regulations enacted by the secondary activities commission. *Id.* We found that the Legislature's creation of the secondary school activities commission to which the county school boards could delegate authority regarding extracurricular activities, as well as the state board retaining final approval over the secondary school activities commission's actions indicated that West Virginia Code § 18–2–25 was not intended to vest county school boards with exclusive control. *Id.* The final factor used to support our conclusion regarding West Virginia Code § 18–2–25 was "the existence of other statutory provisions governing the interrelationship between the State Board of Education and county boards of education indicates that the Legislature intended to permit county board[s] of education regulation of extracurricular activities subject to the general supervision of the State Board of Education." *Id.*; *see* W.Va.Code §§ 18–2–5 and 18–5–3.

We subsequently affirmed the Board's constitutional duty to generally supervise the schools without any interference from the Legislature in *West Virginia Board of Education v. Hechler*, 180 W.Va. 451, 376 S.E.2d 839 (1988), where we addressed the constitutionality of statutory provisions requiring the Board to submit Board approved legislative rules to an oversight commission created by

---

18. *But see State ex rel. Manchin v. West Virginia Secondary Sch. Activities Comm'n*, 178 W.Va. 699, 701, 364 S.E.2d 25, 27 (1987) ("There are other more troubling issues that are not before us, such as whether the legislature may authorize county boards of education to delegate supervision of certain activities to a commission such as the SSAC or, if so, the permissible extent of such delegation.").

the Legislature for review. Under that statute, the oversight commission, upon review, was required to recommend that the Legislature either promulgate the rule in whole or in part or recommend withdrawal of the rule. If the Legislature failed to act on a rule submitted by the oversight commission, then the Board was prohibited from taking any further action on the rule. *Id.* at 452–53, 376 S.E.2d at 840. In declaring those provisions unconstitutional, this Court held in syllabus point two of *Hechler* that the "[r]ule-making by the State Board of Education is within the meaning of 'general supervision' of state schools pursuant to art. XII, § 2 of the *West Virginia Constitution,* and any statutory provision that interferes with such rule-making is unconstitutional." 180 W.Va. at 452, 376 S.E.2d at 839, Syl. Pt. 2, in part.

Following our decisions in *Bailey* and *Hechler,* we hold that notwithstanding the transfer of supervisory authority over interscholastic athletic events and other extracurricular activities to county boards of education and the SSAC, West Virginia Code § 18–2–25 (1994) is constitutional, since it is clear that the Legislature, in enacting said statute, only intended to permit county boards of education and the SSAC to supervise and to regulate extracurricular activities subject to the Board's duty under Article XII, § 2 of the West Virginia Constitution to generally supervise the schools in this state.

Based on the foregoing, the Petitioners' writ of mandamus is granted with regard to the request for a signer and the change in the girls' basketball season; however, the writ is denied as it relates to the constitutionality of West Virginia Code § 18–2–25. The Board is hereby ordered to provide Ms. Lambert with a signer for the 1994–95 basketball season, and to change the girls' high school basketball season beginning with the 1995–96 school year, submitting to this Court its plan for implementing said change by November 1, 1994.

Writ granted in part; denied in part.

NEELY, Justice, dissenting in part:

My personal law clerk this year is a woman who played on the first string Harvard tennis team. Therefore, my office is not entirely ignorant of the interest that women have in sports, but Christmas dinner is seldom delayed in America because wives and mothers are sitting around the television set watching the games.

All of government involves the rationing of scarce resources. A first best solution to most problems always requires the existence of A, B, C, D and E. In the real world, however, we usually don't have A, B, C, D and E simultaneously. Therefore, we must accept a "second best" solution and decide whether we want B, C, D and E; A, B, C and D; D, E, A and B; or some other combination with a missing letter.[1]

In the case of girls' basketball, moving the girls' schedule from the fall to the winter might involve spending substantial money on new athletic facilities in light of the intensity of community support for boys' basketball. Given that money for education is basically fixed, as the regular defeat of excess levies these days clearly demonstrates, the money for new athletic facilities has to be taken from someplace else in education—computers, foreign language instruction, vocational technical training, or science facilities.

The fact that women are equal to men does not mean that women are exactly like men. Wouldn't we look like jackasses if we were to agree to enter a court order giving all males between the ages of 20 and 40 four months of pregnancy leave every three years simply because such leave is regularly given to women? Although in some future world that we may conjure up in fantasy, women's sports teams might draw the same kinds of crowds that men's sports teams draw, that is certainly not the case today. How many people would pay $4 apiece to watch the best women's basketball team West Virginia University ever produced play a comparable team from Indiana? The answer, of course, is that there wouldn't be nearly as many as for a comparable men's team. And what that be-

---

**1.** Lipsey & Lancaster, "The General Theory of Second Best," 24 *Review of Economic Studies* 11–33 (1956–57).

speaks is a market decision made by millions of individuals and expressed collectively through demand for tickets that women's sports do not have a very high *community* priority.

Now all of this might sound like the benighted rantings of a person nostalgic for the 19th Century; nonetheless, if we go to most working class schools in small towns where the school is the center of local social life, we will see that if there is a problem having boys play basketball in the winter because gym space must be apportioned between men and women, a new gym will be built! In fact, the political sentiment in favor of a vigorous sports program for boys (and cheerleading for girls) at the local level is so intense that athletic facilities will generally take precedence over computers, science laboratories, foreign language instruction, vocational technical facilities and compensatory reading programs. That's the real world!

Although after detailed scrutiny of the facts of high school sports none of my fears may be justified, determining when girls' basketball should be played is a decision to be made by the State Board of Education in the first instance. Consequently, I find the majority's holding that there *cannot be* a sufficiently compelling governmental reason to justify playing girls' and boys' sports in different seasons to be contrary to the best interests of education. We must assume that the State Board of Education and local boards of education are as concerned about gender fairness as we are; indeed, the State Board under the pressure of this lawsuit has concluded that *tentatively* there is no reason *not* to merge the girls' and boys' seasons. If, either on the merits or in deference to political pressures the State Board determines such merger to be the best course, then so much the better. But I would not tie the State Board's hands with a premature constitutional ruling predicated on a meager record.

In government there is no such thing as a free lunch: when you help one group, you almost invariably hurt another group. And, frequently the group that you hurt are not in court and, therefore, must be defended by the judges. The people who need defending

in this case where there is no political capital to be made being "against women" are all the users of school programs from which money will be taken if, indeed, moving women's basketball to the winter involves the building of many more gyms or other augmentations of sports-related costs.