622 S.E.2d 289

Daniel JONES and Christie Jones,
Plaintiffs Below, Appellees,

v.

WEST VIRGINIA STATE BOARD OF
EDUCATION; State Superintendent
David Stewart; Marion County Board of
Education; Marion County Superinten-
dent Thomas Long; and West Virginia
Secondary School Activities Commis-
sion, Defendants Below,

West Virginia State Board of Education
and State Superintendent David
Stewart, Appellants.

Daniel Jones and Christie Jones,
Plaintiffs Below, Appellees,

v.

West Virginia State Board of Education;
State Superintendent David Stewart;
Marion County Board of Education;
Marion County Superintendent Thomas
Long; and West Virginia Secondary
School Activities Commission, Defen-
dants Below,

West Virginia Secondary Schools
Activities Commission,
Appellant.

Nos. 31785, 31786.

Supreme Court of Appeals of
West Virginia.

Submitted April 5, 2005.

Decided July 6, 2005.

Dissenting Opinion of Justice
Starcher July 12, 2005.

Dissenting Opinion of Justice
Benjamin Aug. 8, 2005.

Darrell V. McGraw, Jr., Attorney General, Barbara H. Allen, Managing Deputy Attorney General, Charleston, for the Appellants, West Virginia State Board of Education and State Superintendent David Steward.

Randall A. Minor, West Virginia University, College of Law, Morgantown, for the Appellees.

William B. McGinley, Charleston, for Amicus Curiae, West Virginia Education Association.

Stephen R. Brooks, Flaherty, Sensabaugh & Bonasso, Morgantown, for the Appellants, Marion County Board of Education and Marion County Superintendent Thomas Long.

William R. Wooton, Beckley, for the Appellant, West Virginia Secondary School Activities Commission.

Gregory W. Bailey, Bowles Rice McDavid Graff & Love, L.L.P., Charleston, for Amicus Curiae, West Virginia School Boards Association.

Charles F. Donnelly, Jeffrey G. Blaydes, Donnelly & Carbone, P.L.L.C., Charleston, for Amicus Curiae, West Virginia Federation of Teachers, AFL–CIO.

DAVIS, Justice:

This is an appeal from an order of the Circuit Court of Kanawha County rendered in favor of the parents of a home-schooled child with respect to their claim that their child should be permitted to participate in interscholastic athletics notwithstanding his home-schooled status. On appeal, the West Virginia State Board of Education, State Superintendent David Stewart, the Marion County Board of Education, Marion County Superintendent Thomas Long, and the West Virginia Secondary School Activity Commission (hereinafter collectively referred to as "School Officials") argue that the circuit court erred in concluding: (1) that the School Officials had breached a statutory duty by failing to make interscholastic athletics available to home-schooled children; (2) that the legislative rule prohibiting home-schooled children from participating in interscholastic athletics violates equal protection; and (3) that the School Officials breached their duty to make reasonable rules and regulations with respect to the participation of home-schooled children in interscholastic athletics. We agree with the School Officials and reverse the order of the circuit court.

## I.

## FACTUAL AND PROCEDURAL HISTORY

Daniel and Christy Jones (hereinafter "the Joneses"), plaintiffs below and appellees herein, are residents of Marion County, West Virginia. The Joneses have elected to home school their children, including their son Aaron. In 2002, when Aaron was approximately eleven years old, he indicated to his parents his desire to participate on the Mannington Middle School wrestling team. Had Aaron been a student in the public school system, he would have been a sixth grade student at Mannington Middle School. The Joneses investigated the possibility of Aaron joining the Mannington Middle School wrestling team and were advised that they needed approval from the West Virginia Secondary School Activities Commission (hereinafter "the WVSSAC"). Upon contacting the WVSSAC, the Joneses were advised that, pursuant to W. Va.C.S.R. § 127–2–3.1,[1] participation in interscholastic athletic activities was limited to students who were enrolled full-time in a WVSSAC participating school. Consequently, since Aaron was not enrolled as a full-time student at Mannington Middle School, he would not be permitted to participate on the wrestling team. The Joneses received similar responses from Dave Stewart, State Superintendent of Schools, and from the Marion County Board of Education.

Thereafter, on or about December 12, 2002, the Joneses filed a complaint against the School Officials seeking, *inter alia*, declaratory, equitable and injunctive relief. Along with the complaint, the Joneses filed a motion seeking a temporary restraining order and preliminary injunction. Following a preliminary hearing on December 13, 2002, the circuit court entered a preliminary injunction permitting Aaron to immediately participate on the Mannington Middle School wrestling team. At the same time, the circuit court established a briefing schedule and set the matter for a final hearing on February 13, 2003. The final hearing was held and, on September 23, 2003, the circuit court entered its "DECISION AND FINAL ORDER" ruling in favor of the Joneses and declaring that:

1) the defendants have breached their statutory duty under West Virginia Code section 18–8–1(c)(3) by failing to make an available educational resource available to Aaron, 2) the defendants have violated Aaron's right to equal protection, as guaranteed by Article III, section 10 of the West Virginia Constitution, because the blanket prohibition on home schooled students participating in interscholastic athletics fails the applicable rational basis test, and 3) the defendants have breached the duty to promulgate reasonable rules and regulations by implementing a total ban rather than crafting fair rules tailored to any legitimate concerns that may flow from allowing home schooled students, who are otherwise qualified, to participate on sports teams fielded by the public school they would be attending if they were not home schooled.

In addition, the circuit court granted a writ of prohibition directed to the School Officials to "prevent them from exceeding their statutory and constitutional authority by excluding otherwise qualified home schooled students from participating on sports teams fielded by public schools." Finally, the circuit court issued a writ of mandamus

a. to compel the defendants to comply with their statutory duty to afford the plaintiffs access to available educational resources, which includes participation in interscholastic athletics;

b. to compel the defendants to afford the plaintiffs and their son the right to equal protection, as guaranteed by the West Virginia Constitution, which means that the defendants shall not give effect to the enrollment rule that

---

1. W. Va.C.S.R. § 127–2–3.1 states:
 To be eligible for participation in interscholastic athletics, a student must be enrolled full-time in a member school as described in Rule 127–2–6 on or before the eleventh instructional day of the school year. Enrollment must be continuous after the student has officially enrolled in the school.
 The rule referred to in this section, found at W. Va.C.S.R. § 127–2–6, describes the criteria for being enrolled "full-time."

excludes home schooled students from interscholastic athletics;

c. to compel the defendants to comply with their statutory duty to promulgate reasonable rules, which shall not include an enrollment rule that results in the blanket prohibition against home schooled students participating in interscholastic athletics; and

d. to compel the defendants to allow the plaintiffs' son, Aaron, to try out for and, if successful, to compete on any sports team that is being fielded by the public school Aaron would otherwise attend were he not being home schooled.

It is from this order of the circuit court that the School Officials now appeal.

## II.

### STANDARD OF REVIEW

■ In this appeal we are asked to review a final order rendered by a circuit court. We apply a three-part standard of review to such an order:

In reviewing challenges to the findings and conclusions of the circuit court, we apply a two-prong deferential standard of review. We review the final order and the ultimate disposition under an abuse of discretion standard, and we review the circuit court's underlying factual findings under a clearly erroneous standard. Questions of law are subject to a de novo review.

Syl. pt. 2, *Walker v. West Virginia Ethics Comm'n*, 201 W.Va. 108, 492 S.E.2d 167 (1997). We are also asked to review the circuit court's award of extraordinary relief in the form of writs of mandamus and prohibition. These rulings are reviewed de novo. "The standard of appellate review of a circuit court's order granting relief through the extraordinary writ of mandamus is de novo." Syl. pt. 1, *Staten v. Dean*, 195 W.Va. 57, 464 S.E.2d 576 (1995). *Accord* Syl. pt. 1, *Rollyson v. Jordan*, 205 W.Va. 368, 518 S.E.2d 372

(1999). "The standard of appellate review of a circuit court's order granting relief through the extraordinary writ of prohibition is de novo." Syl. pt. 1, *Martin v. West Virginia Div. of Labor Contractor Licensing Bd.*, 199 W.Va. 613, 486 S.E.2d 782 (1997). With regard for these standards, we proceed to address the issues herein raised.

## III.

### DISCUSSION

The circuit court expressed three grounds for finding that the School Officials had improperly denied the Joneses' request that their home-schooled child be allowed to participate in interscholastic athletics: (1) that the School officials had breached a statutory duty; (2) that they had violated the home-schooled student's right to equal protection; and (3) that they had breached the duty to promulgate reasonable rules and regulations. We addresses each of these issues in turn.[2]

### A. *Statutory Duty*

■ The circuit court concluded that the School Officials breached a statutory duty by failing to make interscholastic athletics available to home-schooled children. To determine if the circuit court was correct in this conclusion, we first look to the language of the statute purportedly violated by the School Officials, W. Va.Code § 18-8-1(c)(3) (2003) (Repl. Vol. 2003), which states:

This subdivision applies to both home instruction exemptions set forth in subdivisions (1) and (2) of this subsection. The county superintendent or a designee *shall offer such assistance, including* textbooks, other teaching materials and *available resources, as may assist the person or persons providing home instruction* subject to their availability. Any child receiving home instruction may upon approval of the county board exercise the option to attend any class offered by the county board as the person or persons providing home instruction may consider appropriate subject

---

2. We pause to acknowledge the appearance of various amici curiae in this matter: The West Virginia Federation of Teachers, AFL–CIO; The West Virginia School Boards Association; and The West Virginia Education Association. We

appreciate the contributions of these amici, and consider their positions in connection with the arguments of the parties with whom they are aligned.

to normal registration and attendance requirements. .

(Emphasis added).[3]

. With respect to the portion of this provision that requires a county superintendent to "offer such assistance, including textbooks, other teaching materials and available resources, as may assist the person or persons providing home instruction subject to their availability," the circuit court first reasoned that

> [t]here is no dispute that participation in interscholastic athletics offers an individual student opportunities to learn important life lessons and expands the educational experience beyond the four walls of the traditional classroom. Therefore, it is arguable that the coaching and facilities that are available to a student athlete could be considered an available educational resource within the meaning of the aforementioned statute.

The court then concluded that "[t]he defendants have breached their statutory duty under the above-quoted portion of West Virginia Code section 18–8–1(c)(3) by failing to make interscholastic sports available to Aaron." This conclusion by the circuit court simply is not supported by the language contained in this statute.

▮▮▮ Initially, we observe that "[t]he primary object in construing a statute is to ascertain and give effect to the intent of the Legislature." Syl. pt. 1, *Smith v. State Workmen's Comp. Comm'r,* 159 W.Va. 108, 219 S.E.2d 361 (1975). However, "[w]hen a statute is clear and unambiguous and the legislative intent is plain, the statute should not be interpreted by the courts, and in such case it is the duty of the courts not to construe but to apply the statute." Syllabus point 5, *State v. General Daniel Morgan Post No. 548, Veterans of Foreign Wars,* 144 W.Va. 137, 107 S.E.2d 353 (1959). We find

no ambiguity in the provision relied upon by the circuit court. " ' "Where the language of a statute is free from ambiguity, its plain meaning is to be accepted and applied without resort to interpretation." Syl. Pt. 2, *Crockett v. Andrews,* 153 W.Va. 714, 172 S.E.2d 384 (1970).' Syllabus Point 4, *Syncor International Corp. v. Palmer,* 208 W.Va. 658, 542 S.E.2d 479 (2001)." Syl. pt. 4, *Charter Communications VI, PLLC v. Community Antenna Serv., Inc.,* 211 W.Va. 71, 561 S.E.2d 793 (2002).

▮▮▮ In plain language, this provision refers to providing resources "as may assist *the person or persons providing home instruction.*" W. Va.Code § 18–8–1(c)(3). Clearly, this statute pertains to providing educational resources to the person or persons providing instruction, who, in this case, was Mrs. Jones. Because the statute does not address providing resources, such as interscholastic sports, to a home-schooled student, we are not at liberty to judicially add such a provision. " '[I]t is not for [courts] arbitrarily to read into [a statute] that which it does not say. Just as courts are not to eliminate through judicial interpretation words that were purposely included, *we are obliged not to add to statutes something the Legislature purposely omitted.*' *Banker v. Banker,* 196 W.Va. 535, 546–47, 474 S.E.2d 465, 476–77 (1996) (*citing Bullman v. D & R Lumber Company,* 195 W.Va. 129, 464 S.E.2d 771 (1995); *Donley v. Bracken,* 192 W.Va. 383, 452 S.E.2d 699 (1994)). ([E]mphasis added). *See State ex rel. Frazier v. Meadows,* 193 W.Va. 20, 24, 454 S.E.2d 65, 69 (1994). Moreover, '[a] statute, or an administrative rule, may not, under the guise of "interpretation," be modified, revised, amended or rewritten.' Syl. pt. 1, *Consumer Advocate Division v. Public Service Commission,* 182 W.Va. 152, 386 S.E.2d 650 (1989). *See Sowa v. Huffman,*

---

**3.** An earlier version of this code section was actually in place at the time the Joneses filed their law suit, but it does not differ substantively from the current version:

> The superintendent or a designee shall offer such assistance, including textbooks, other teaching materials and available resources, as may assist the person or persons providing home instruction subject to their availability.

Any child receiving home instruction may, upon approval of the county board of education, exercise the option to attend any class offered by the county board of education as the person or persons providing home instruction may deem appropriate subject to normal registration and attendance requirements.

W.Va.Code § 18–8–1(c) (2001) (Supp. 2001).

191 W.Va. 105, 111, 443 S.E.2d 262, 268 (1994)." *Williamson v. Greene*, 200 W.Va. 421, 426–27, 490 S.E.2d 23, 28–29 (1997). *Longwell v. Board of Educ. of County of Marshall*, 213 W.Va. 486, 491, 583 S.E.2d 109, 114 (2003). *Accord State ex rel. Blankenship v. Richardson*, 196 W.Va. 726, 735, 474 S.E.2d 906, 915 (1996) (" '[T]he judiciary may not sit as a superlegislature to judge the wisdom or desirability of legislative policy determinations made in areas that neither affect fundamental rights nor proceed along suspect lines.' " (quoting *Lewis v. Canaan Valley Resorts, Inc.*, 185 W.Va. 684, 692, 408 S.E.2d 634, 642 (1991))). Therefore, we find the circuit court erred in concluding that the School Officials breached their duty under W. Va.Code § 18–8–1(c)(3).

### B. Equal Protection

 The circuit court concluded that, by excluding home-schooled children from participation in interscholastic athletics, the School Officials have violated the equal protection rights of home-schooled children. *See* West Virginia Const. art III, § 10. "Equal protection of the law is implicated when a classification treats similarly situated persons in a disadvantageous manner. The claimed discrimination must be a product of state action as distinguished from a purely private activity." Syl. pt. 2, *Israel by Israel v. West Virginia Secondary Sch. Activities Comm'n*, 182 W.Va. 454, 388 S.E.2d 480 (1989). Here, there is no question that the equal protection claim involves state action, so we will proceed with our analysis.

 The complained of classification established by the School Officials treats home-schooled children differently from children who are enrolled in the public schools with respect to their eligibility to participate in interscholastic athletics. This Court has previously recognized that

[p]articipation in nonacademic extracurricular activities, including interscholastic athletics, does not rise to the level of a fundamental or constitutional right under article XII, § 1 of the West Virginia Constitution. Therefore, its regulation need only be rationally related to a legitimate purpose.

*Bailey v. Truby*, 174 W.Va. 8, 23, 321 S.E.2d 302, 318 (1984). In other words, a "classification[ ] not affecting a fundamental right or some suspect or quasi-suspect criterion ... will be sustained so long as it 'is rationally related to a legitimate state interest.' " *Appalachian Power Co. v. State Tax Dep't of West Virginia*, 195 W.Va. 573, 594, 466 S.E.2d 424, 445 (1995) (quoting *City of Cleburne, Tex. v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 440, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313, 320 (1985) (additional citations omitted)). *See also Janasiewicz v. Board of Educ. of Kanawha County*, 171 W.Va. 423, 426, 299 S.E.2d 34, 37 (1982) ("Equal protection requires that similarly situated classes be treated alike.... When there is a rational basis to distinguish between groups of individuals, not based on invidious discrimination, then different treatment does not offend equal protection provisions." (internal citations omitted)).

In a case similar to the one at bar, which addressed the issue of whether the state could refuse to provide school bus transportation to students attending parochial schools, this Court explained that

[p]ublic and parochial school children may rationally be treated differently because they are not similarly situated. All children under sixteen years old are required to attend approved schools; but a parochial school student has chosen to reject a free public school education in favor of a privately paid education emphasizing religious beliefs and principles.

*Janasiewicz v. Board of Educ. of Kanawha County*, 171 W.Va. 423, 426, 299 S.E.2d 34, 37–38. The *Janasiewicz* Court went on to hold:

The Equal Protection Clause of the Fourteenth Amendment is not violated by treating public and nonpublic school children differently in allocations of state aid and educationally-related resources. We overrule Syllabus Point 2 of *State ex rel. Hughes v. Board of Education*, 154 W.Va. 107, 174 S.E.2d 711 (1970).

Syl. pt. 2, *Id.* Having already determined that treating public and nonpublic school children differently in allocations of state aid and

educationally-related resources does not offend equal protection, we have no difficulty concluding that treating public and nonpublic school children differently with respect to participation in interscholastic sports does not violate equal protection.

As with the parochial students in *Janasiewicz,* the parents of home-schooled children have *voluntarily chosen* not to participate in the free public school system in order to educate their children at home. In making this choice, these parents have also chosen to forego the privileges incidental to a public education, one of which is the opportunity to qualify for participation in interscholastic athletics.[4]

Moreover, the School Officials have asserted numerous grounds supporting a rational basis for excluding home-schooled children from participation in interscholastic athletics. Two of these grounds we find particularly persuasive: (1) promoting academics over athletics, and (2) protecting the economic interests of the county school systems.

With respect to promoting academics over athletics, the School Officials note that the WVSSAC has, in keeping with the policies and rules of the West Virginia Board of Education, imposed grade requirements which must be met for a student to participate in interscholastic sports. In particular, one rule of the WVSSAC requires that "[i]n accordance with West Virginia Board of Education § 126–26–1 et seq., 'Participation in Extracurricular Activities' (Policy 2436.10, C–Rule),[5] students must maintain a 2.0 average to participate in interscholastic athletics." W. Va.C.S.R. § 127–2–6.9 (footnote added). Moreover, "[a] student is required to do passing work in the equivalent of at least 20 periods (four subjects with full credit toward graduation) per week. Failure to earn passing marks in four full credit subjects during a semester shall render a stu-

dent ineligible for the following semester." W. Va.C.S.R. § 127–2–6.1.

Children who are home schooled may be taught a completely different curriculum than children in the public school system. More importantly, though, is the fact that regardless of the curriculum, home-schooled children are graded differently from those in the public school system. Instead of receiving semester grades, home-schooled children are evaluated only once yearly through either a standardized test, examination of the student's work portfolio, or by completing "an alternative academic assessment of proficiency that is mutually agreed upon by the parent or legal guardian and the county superintendent." W. Va.Code § 18–8–1(c)(2)(D)(I–iv) (2003) (Repl. Vol. 2003). The School Officials maintain that attempting to convert the progress assessments of home-schooled children into a numerical formula in order to equate it to the 2.0 average that is required for participation in interscholastic athletics would create an undue burden on the county school systems.

Furthermore, the different grading standards and methods used for home-schooled children would significantly impede the School Official's ability to maintain the academic standards that have been established for participation in interscholastic athletics. For example, the School Officials point out that allowing home-schooled children to participate in interscholastic athletics would create a risk of mischief on the part of some parents of athletically skilled, yet academically struggling, children. Specifically, a parent could withdraw an academically struggling child from the public school system in order to maintain his or her athletic-eligibility, thereby thwarting the efforts of the public school system to promote academics over athletics.

Finally, the School Officials maintain that the public schools would suffer financially

---

**4.** To the extent that parents desire their home-schooled child to experience the many benefits of team or individual athletics, there typically are ample opportunities for such participation outside the realm of interscholastic athletics.

**5.** W. Va.C.S.R. § 126–26–1 et seq. contains the State Board of Education legislative rules for

participation in extracurricular activities and states, in relevant part, that "[i]n order to participate in the extracurricular activities to which this policy applies, a student must: 3.1 Maintain a 2.0 average.... AND 3.2 Meet State and local attendance requirements." W. Va.C.S.R. § 126–26–3.

from the participation of home-schooled children in interscholastic sports. They explain that county school boards receive funding for their athletic programs based upon a formula that takes into consideration their average daily attendance and enrollment numbers. *See* W. Va.Code § 18–9A–9(1) (1994) (Repl. Vol. 2003). Home-schooled children do not contribute to the average daily attendance or enrollment numbers of the public schools, thus no funds are expended to the county boards in consideration of those children. To then require counties to spend these limited funds to support the athletic participation of home-schooled students would create a financial burden.

Based upon the foregoing discussion, we now hold that prohibiting home-schooled children from participating in interscholastic athletics does not violate equal protection under art. III, § 10 of the West Virginia Constitution.

### C. Duty to Promulgate Reasonable Rules and Regulations

The circuit court concluded that

the defendants have breached the duty to promulgate reasonable rules and regulations by implementing a total ban rather than crafting fair rules tailored to any legitimate concerns that may flow from allowing home schooled students, who are otherwise qualified, to participate on sports teams fielded by the public school they would be attending if they were not home schooled.

We disagree.

With respect to legislative rules, this Court has explained that

"[i]t is fundamental law that the Legislature may delegate to an administrative agency the power to make rules and regulations to implement the statute under which the agency functions. In exercising that power, however, an administrative agency may not issue a regulation which is inconsistent with, or which alters or limits its statutory authority." Syllabus Point 3,

*Rowe v. Department of Corrections,* 170 W.Va. 230, 292 S.E.2d 650 (1982).

Syl. pt. 3, *Ney v. State Workmen's Comp. Comm'r,* 171 W.Va. 13, 297 S.E.2d 212 (1982). *See also Anderson & Anderson Contractors, Inc. v. Latimer,* 162 W.Va. 803, 807–08, 257 S.E.2d 878, 881 (1979) ("Although an agency may have power to promulgate rules and regulations, the rules and regulations must be reasonable and conform to the laws enacted by the Legislature." (citation omitted)).

With respect to our analysis of whether a specific legislative rule comports with its statutory authority, this Court has established that

[j]udicial review of an agency's legislative rule and the construction of a statute that it administers involves two separate but interrelated questions, only the second of which furnishes an occasion for deference. In deciding whether an administrative agency's position should be sustained, a reviewing court applies the standards set out by the United States Supreme Court in *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). The court first must ask whether the Legislature has directly spoken to the precise question at issue. If the intention of the Legislature is clear, that is the end of the matter, and the agency's position only can be upheld if it conforms to the Legislature's intent. No deference is due the agency's interpretation at this stage.

Syl. pt. 3, *Appalachian Power Co. v. State Tax Dep't of West Virginia,* 195 W.Va. 573, 466 S.E.2d 424 (1995).

The legislative rule at issue in this case directs that,

[t]o be eligible for participation in interscholastic athletics, a student must be enrolled full-time in a member school as described in Rule 127–2–6 [6] on or before the eleventh instructional day of the school year. Enrollment must be continuous after the student has officially enrolled in the school.

W. Va.C.S.R. § 127–2–3.1 (footnote added).[7] There is no accompanying statutory provi-

---

6. W. Va.C.S.R. § 127–2–6 describes the criteria for being enrolled "full-time."

7. The rules do provide for certain exceptions, but those exceptions do not apply to home-schooled

sion that expressly excludes home-schooled children from participation in interscholastic athletics. Accordingly, we must presume that the Legislature entrusted this decision to the WVSSAC. *See Appalachian Power Co.*, 195 W.Va. 573, 589, 466 S.E.2d 424, 440 (" '[i]n the absence of ... [legislative] direction as to what elements are to be considered in promulgating ... [a] rule, the presumption is that ... [the Legislature] is entrusting the decision as to what to consider to the hands of the agency in deference to the agency expertise.' ") (alteration in original) (quoting *Kennedy v. Block*, 606 F.Supp. 1397, 1403 (W.D.Va.1985), *vacated on other grounds by* 784 F.2d 1220 (4th Cir.1986)).

■ This brings us to the second part of the analysis:

If legislative intent is not clear, a reviewing court may not simply impose its own construction of the statute in reviewing a legislative rule. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute. A valid legislative rule is entitled to substantial deference by the reviewing court. As a properly promulgated legislative rule, the rule can be ignored only if the agency has exceeded its constitutional or statutory authority or is arbitrary or capricious. W. Va.Code, 29A–4–2 (1982).

Syl. pt. 4, *Appalachian Power.* Likewise, we have long held that " '[i]nterpretations of statutes by bodies charged with their administration are given great weight unless clearly erroneous.' Syl. Pt. 4, *Security Nat'l Bank & Trust Co. v. First W. Va. Bancorp.[, Inc.]*, 166 W.Va. 775, 277 S.E.2d 613 (1981)." Syl. pt. 3, *Corliss v. Jefferson County Bd. of Zoning Appeals*, 214 W.Va. 535, 591 S.E.2d 93 (2003). *See also Board of Educ. of County of Taylor v. Board of Educ. of County of Marion*, 213 W.Va. 182, 188, 578 S.E.2d 376, 382 ( 2003) (same); Syl. pt. 3, *Smith v. Board*

*of Educ. of Logan County*, 176 W.Va. 65, 341 S.E.2d 685 (1985) (same).

■ We will first consider whether the WVSSAC has exceeded its constitutional or statutory authority. The Legislature established the WVSSAC and gave the county boards of education the option to "delegate ... control, supervision and regulation of interscholastic athletic events and band activities to the [WVSSAC] ...." W. Va.Code § 18–2–25 (1967) (Repl. Vol. 2003). This Court has previously examined this statutory provision, and found it to be Constitutional:

Notwithstanding the transfer of supervisory authority over interscholastic athletic events and other extracurricular activities to county boards of education and the West Virginia Secondary School Activities Commission, West Virginia Code § 18–2–25 (1994) is constitutional, since it is clear that the Legislature, in enacting said statute, only intended to permit county boards of education and the West Virginia Secondary School Activities Commission to supervise and to regulate extracurricular activities subject to the West Virginia State Board of Education's duty under Article XII, § 2 of the West Virginia Constitution to generally supervise the schools in this state.

Syl. pt. 6, *State ex rel. Lambert by Lambert v. West Virginia State Bd. of Educ.*, 191 W.Va. 700, 447 S.E.2d 901 (1994). Having previously concluded that the WVSSAC's control of interscholastic athletics does not exceed constitutional authority, we must now decide whether its promulgation of governing rules has exceeded its statutory authority.

■ Within W. Va.Code § 18–2–25, the statute creating the WVSSAC, the Legislature has directed that the WVSSAC be "empowered to exercise the control, supervision and regulation of interscholastic athletic events and band activities of secondary schools, delegated to it pursuant to this sec-

---

children. *See, e.g.,* W. Va.C.S.R. § 127–2–3.2 ("Students can participate only in schools in which they are enrolled; however, an exception may be granted by the Board of Directors as follows: 3.2.1 if a feeder school does not afford students the opportunity to participate and they

are otherwise eligible."); W. Va.C.S.R. § 127–2–3.5 ("[s]ixth grade students may be eligible to participate in the interscholastic sport teams except football in the middle school in which they are enrolled.").

tion." [8] While this statement does not expressly grant to the WVSSAC the power to promulgate rules and regulations, a complete reading of the statute plainly indicates that this was the Legislatures intent. *See* Syl. pt. 2, *Rose ex rel. Rose v. St. Paul Fire & Marine Ins. Co.*, 215 W.Va. 250, 599 S.E.2d 673 (2004) (" 'The primary object in construing a statute is to ascertain and give effect to the intent of the Legislature.' Syllabus Point 1, *Smith v. State Workmen's Compensation Com'r*, 159 W.Va. 108, 219 S.E.2d 361 (1975)."); *State ex rel. Morgan v. Trent*, 195 W.Va. 257, 263, 465 S.E.2d 257, 263 (1995) (" '[I]n ascertaining legislative intent, effect must be given to each part of the statute and to the statute as a whole so as to accomplish the general purpose of the legislation.' Syl. Pt. 2, *Smith v. State Workmen's Compensation Commissioner*, 159 W.Va. 108, 219 S.E.2d 361 (1975)." (additional quotations and citations omitted)). Indeed, the very next sentence in this statute plainly reflects the legislatures intention that the WVSSAC have the authority to promulgate rules and regulations by presupposing the existence of such rules: "The rules and regulations of the West Virginia secondary school activities commission shall contain a provision for a proper review procedure and review board and be promulgated in accordance with the provisions of chapter twenty-nine-a [§§ 29A-1-1 et seq.] of this Code ...." W. Va.Code § 18-2-25. This statute goes further to mandate that the WVSSAC

> shall promulgate reasonable rules and regulations providing for the control, supervision and regulation of the interscholastic athletic events and other extracurricular activities of such private and parochial secondary schools as elect to delegate to such commission such control, supervision and regulation, *upon the same terms and conditions, subject to the same regulations and requirements* and upon the payment of the same fees and charges *as those provided for public secondary schools.*

*Id.* (emphasis added). Thus, the Legislature has expressly directed the WVSSAC promulgate reasonable rules and regulations with respect to private and parochial secondary schools, and has mandated that those rules and regulations correspond with rules provided for public secondary schools. This demonstrates without a doubt that the Legislature intended the WVSSAC to promulgate rules to carry out its control, supervision and regulation of interscholastic athletic events with respect to the public schools in those counties electing to delegate such control to the WVSSAC.

Additionally, we note that the Legislature empowered the WVSSAC "to exercise ... control, supervision and regulation of *interscholastic athletic events.*" W. Va.Code § 18-2-25. Primary to exercising such authority over "athletic events" is determining who is eligible to participate in such events, as the WVSSAC has done in the legislative rule at issue in this case. Therefore, we find the WVSSAC has not exceeded its statutory authority in promulgating a rule pertaining to the eligibility requirements for participating in interscholastic athletics.

The final portion of our analysis under Syllabus point 4 of *Appalachian Power* is to determine whether the legislative rule in question is arbitrary or capricious. Again, the specific legislative rule at issue requires that

> [t]o be eligible for participation in interscholastic athletics, a student must be enrolled full-time in a member school as described in Rule 127-2-6 [9] on or before the eleventh instructional day of the school year. Enrollment must be continuous after the student has officially enrolled in the school.

W. Va.C.S.R. § 127-2-3.1. Our discussion under the "Equal Protection" portion of this opinion, Section III.B., *supra*, demonstrates that this rule is not arbitrary or capricious as it is rationally related to the legitimate state purposes of promoting academics over athletics and protecting the economic interests of the county school systems. Therefore, based upon the full discussion set out above, we now hold that the West Virginia Secondary Schools Activities Commission did not violate its constitutional or statutory authority in

---

8. The Marion County Board of Education has elected to delegate its interscholastic athletic program to the WVSSAC.

9. W. Va.C.S.R. § 127-2-6 describes the criteria for being enrolled "full-time."

promulgating the legislative rule found at W. Va.C.S.R. § 127–2–3.1, which requires that, to be eligible for participation in interscholastic athletics, a student must be enrolled full-time in a school participating in the West Virginia Secondary Schools Activities Commission.

## IV.

### CONCLUSION

For the reasons stated in the body of this opinion, we reverse the September 23, 2003, order of the Circuit Court of Kanawha County, including the writs of mandamus and prohibition therein granted.

Reversed.

Justices STARCHER and BENJAMIN dissent and file dissenting opinions.

STARCHER, J., dissenting:

(Filed July 12, 2005)

The majority opinion strains to reach a wrong result.

There is not a shred of evidence that any home-schooled child would in any way do anything but enhance interscholastic athletics. I wish that the majority had not wanted to protect the convenience of coaches over the rights of children and parents.

I dissent, and I assert as grounds for that dissent the learned opinion by Circuit Judge Louis Bloom, who properly applied the applicable constitutional law. The reader can compare the majority opinion's reasoning with Judge Bloom's. Following is Judge Bloom's opinion in the lower court:

On the 13th day of February 2003, came the plaintiffs, Daniel and Christie Jones, in person and by their counsel, Randal A. Minor, and came also defendants West Virginia State Board of Education and Dr. David Stewart, State Superintendent of Education, by their counsel, Barbara H. Allen, Managing Deputy Attorney General, defendant West Virginia Secondary School Activities Commission, by its counsel, William R. Wooton, and defendants Marion County Board of Education and Thomas Long, Marion County Superintendent of Schools, by their counsel, Robert L. Coffield, for a final hearing in the above-styled action. By order entered on January 14, 2003, the court had heretofore granted the plaintiffs' motion for a preliminary injunction, thereby allowing the plaintiffs' son to join the Mannington Middle School wrestling team for the 2002–2003 school year.

By leave of court, the West Virginia Educational Association filed an *amicus* brief. Upon mature consideration of said amicus brief, the pleadings, memoranda and arguments of the parties, the pertinent law and all matters of record, the court hereby finds and concludes as follows:

### FINDINGS OF FACT

1. The plaintiffs, Daniel and Christie Jones (hereafter jointly "the plaintiffs"), reside in Mannington, Marion County, West Virginia.

2. At the time this action was heard, the plaintiffs' eldest child, Aaron Jones (hereafter "Aaron"), was eleven years old and, if he attended public school, he would have been in the sixth grade at Mannington Middle School.

3. Defendant West Virginia State Board of Education, more properly called the West Virginia Board of Education (hereafter "the State Board"), is a constitutional body charged with the general supervision of West Virginia's public schools and with making rules to implement the laws and policies of the State relating to education.

4. The State Board's supervisory role encompasses extracurricular activities, including band and interscholastic athletics, such as the wrestling program at Mannington Middle School.

5. Defendant Dr. David Stewart (hereafter "Superintendent Stewart") is West Virginia's Superintendent of Schools. As such, he is the chief executive officer of the State Board and bears responsibility for the general supervision of West Virginia's public schools, county superintendents and county boards of education. W. Va.Code § 18–3–3.

6. Defendant Marion County Board of Education (hereafter "the Marion County Board") is an elected body responsible for the supervision and control of the educational system in Marion County, which includes the Mannington Middle School. W. Va.Code §§ 18–5–1 and 18–5–13.

7. Defendant Thomas Long is the Superintendent of Schools for Marion County, West Virginia. As such, he is the chief executive officer of the Marion County Board and is charged with executing, under the direction of the State Board, all of its educational policies. W. Va. Code § 18–4–10.

8. Defendant West Virginia Secondary School Activities Commission (hereafter "WVSSAC") is a quasi-public body, established pursuant to West Virginia Code section 18–2–25, to whom county boards of education may delegate the authority to control, supervise and regulate band activities and interscholastic athletics for the secondary schools in their respective counties. W. Va.Code § 18–2–25. Such authority remains subordinate to the overriding supervisory powers of the State Board.

9. The Marion County Board has exercised the statutory option of delegating to the WVSSAC the authority to control, supervise and regulate interscholastic athletics for the public schools in Marion County.

10. West Virginia provides parents with the option of having their children home schooled, subject to certain conditions and restrictions. W. Va.Code § 18–8–1(c).[1]

11. Since the time, at age six, when Aaron became subject to the State's compulsory school attendance laws, the plaintiffs have availed themselves of the home schooling option. This choice was based on a variety of reasons, including religious and moral concerns.

12. The plaintiffs' have complied with the requirements to notify the Marion County Board or its superintendent of their intent to home school and have submitted the requisite plan of instruction.

13. The plaintiffs' children receive instruction from plaintiff Christie Jones (hereafter individually "Mrs. Jones"), who utilizes a structured Christian curriculum produced commercially by the A Beka Book Company of the Pensacola Christian College.

14. The program of instruction includes testing in each subject every nine weeks. Every nine weeks Mrs. Jones uses the A Beka program to generate a detailed progress report for each child. Mrs. Jones also maintains portfolios of each child's school work for the academic year.

15. Pursuant to West Virginia Code section 18–8–1(c)(2)(D), home schooled children must undergo an annual academic assessment and submit the results to the county superintendent. This assessment requirement may be met through several different mechanisms, which include taking a nationally normed standardized achievement test or through a portfolio review of the student's work by a state-certified teacher.

16. In general, the State's interest in the home schooled child's academic performance is satisfied if the child's score in the required subjects is in or above the fiftieth percentile[2] on the standardized test or, if below the fiftieth percentile, the result represents an improvement over the previous year. The academic standards are also met if, upon review of the child's portfolio of work, a certified teacher provides a narrative report verifying that the child's academic progress

---

1. The pertinent portion of the statute was formerly W. Va.Code 18–8–1, *Exemption B*. The statutory changes took effect in March 2003, so the memoranda and the arguments of the parties refer to the earlier code section. The statutory changes do not have any substantive bearing on the disposition of this case.

2. Until the statutory amendment took effect in March 2003, the fortieth percentile was acceptable.

is in accordance with that child's abilities.

17. Dr. Edwina Pendarvis, who appeared as an expert for the plaintiffs, testified that a teacher conducting a portfolio review would be able to give the student a grade.

18. For the past three years, the plaintiffs have elected to satisfy the progress review requirements of the home schooling statute by having Aaron participate in standardized testing.

19. Aaron's performance on said standardized tests has remained above the fiftieth percentile.

20. In or about the spring of 2002, Aaron decided that he would like to participate on the Mannington Middle School wrestling team. The plaintiffs supported him in this goal and made inquiries of school officials as to whether Aaron could join the team.

21. Rick Rinehart, the wrestling coach at Mannington Middle School, and Mike Hays, the school's activities director, informed the plaintiffs that they had no objection to Aaron joining the team. However, Mike Hays advised the plaintiffs that Aaron's participation on the team would have to be approved by the WVSSAC.

22. The WVSSAC refused to allow Aaron to participate on the Mannington Middle School wrestling team on the ground that Title 127, Series 2, section 3.1 of the West Virginia Code of State Regulations (hereafter "WVSSAC Rule 127–2–3.1") restricts participation in interscholastic athletic activities to students who are enrolled on a full-time basis in a WVSSAC-member school.[3]

23. The WVSSAC regulations do not reference home schooled children.

24. According to the testimony of Mike Hayden, Executive Director of the WVSSAC (hereafter "Director Hayden"), membership in the WVSSAC is not open to individuals or home schooled families.

25. The decision by the WVSSAC to refuse to allow Aaron to wrestle for Mannington Middle School because he is not enrolled in a member school was subsequently upheld, both in rationale and in result, by Superintendent Stewart.

26. By correspondence, dated September 16, 2002, the plaintiffs sought an appeal to the WVSSAC Board of Appeals to challenge the decision that Aaron was not eligible for the Mannington Middle School wrestling team.

27. By correspondence, dated September 23, 2002, Director Hayden advised the plaintiffs that the policies of the WVSSAC preclude the WVSSAC Board of Appeals from hearing an eligibility appeal by a student who is not enrolled in a member school. Director Hayden further informed the plaintiffs that the only way Aaron would be permitted to wrestle would be if he enrolled as a full-time student at Mannington Middle School.

28. The original purpose behind the enrollment rule was to prevent one school from recruiting athletes from another school. This purpose has no application to the facts of this case.

29. The plaintiffs ultimately filed this action and, on January 14, 2003, a preliminary injunction was granted that allowed Aaron to wrestle on the Mannington Middle School team during the season that began on December 14, 2002 and concluded on February 1, 2003.

30. Under the current policy of the WVSSAC regarding academic standards for participation in interscholastic athletics, which is set forth at Title 127, series 2, section 6 of the West Virginia Code of State Regulations, a student must do

---

**3.** During oral argument in an unrelated case before the Supreme Court of Appeals of West Virginia, the State Board represented to the Court "not only that secondary schools did not have to be a member of the SSAC to participate in interscholastic sports, but also that the SSAC was going to stop collecting dues charged for membership in the SSAC." *State ex rel. Lambert by Lambert v. West Virginia State Board of Education,* 191 W.Va. 700, 447 S.E.2d 901 (1994). None of the parties addressed this apparent discrepancy between these representations and the practices currently in place.

passing work in the equivalent of 20 periods (4 subjects with full credit toward graduation) per week. Failure to earn passing marks in four full-credit subjects during a semester renders a student ineligible to participate in interscholastic athletics for the following semester.

31. The WVSSAC rule, found at Title 127, series 2, section 6.9 of the West Virginia Code of State Regulations, requires "students to maintain a 2.0 average to participate in interscholastic athletics." This rule states that it is based upon "West Virginia Board of Education Policy 2436.10 'Participation in Extracurricular Activities.'"

32. Home schooled students are permitted to participate in a public school's band activities as long as those students enroll in a band class.

33. Home schooled children can participate in band activities even if they fail to satisfy the academic eligibility requirements set forth in Title 127, series 5, section 3.1 of the West Virginia Code of State Regulations. These are precisely the same as the eligibility requirements for interscholastic athletics, which are set forth at Title 127, series 2, section 6.1 of the West Virginia Code of State Regulations, *i.e.*, passing work in the equivalent of 20 periods per week.

34. No evidence was presented that the participation of home schooled children in a public school's band has had any ill effects on the school or any of the students.

35. Physical education is part of the high school curriculum. There is a one-credit requirement, according to William Cameron Walton, principal of South Charleston High School.

36. No evidence was presented that Aaron's participation on the Mannington Middle School wrestling team had any ill effects on Aaron, the school or any of the students.

37. To the contrary, Mrs. Jones testified that Aaron was aware that he would not be allowed to wrestle if his academic performance slipped. This gave him motivation to remain focused on his academic studies.

38. Aaron's father testified that, as a member of the Mannington Middle School wrestling team, Aaron's physical conditioning improved, he made new friends and he enjoyed a team environment where the members were supportive of one another.

39. Rick Rinehart, the Mannington Middle School wrestling coach, testified that wrestling was a positive experience for Aaron, who worked hard and improved his skills. He reported that there was no reduction in the level of support for the wrestling team, nor were there any discipline problems with Aaron or other team members, as a result of Aaron's presence on the team. He also testified that he would like to see Aaron return to the team.

40. Aaron also testified and explained that his teammates did not treat him differently, that he had fun, and that he made friends on the team.

41. According to the testimony of Mike Hays, the Mannington Middle School's activities director, there are certain basics a school will have to have in place in order to field an athletic team. The costs for those basics must be met whether or not there is a home schooled student on the team.

42. Additional money for athletics comes through gate receipts, donations and fund-raising activities.

43. Pursuant to the pertinent provisions of West Virginia Code section 18–8–1(c)(3), home schooled children may, with the approval of the county board of education, "attend any class offered by the county board[.]"

44. No evidence was presented that such *ad hoc* participation in public school classes by students who are otherwise home schooled has any adverse impact on such home schooled students, their public school classmates or the school in general.

45. According to correspondence, dated February 10, 2003 from Bob Mitts, Un-

derwriting Manager at the Board of Risk and Insurance Management, the participation of home schooled children in school-sponsored activities does not limit the liability coverage that would otherwise apply.

46. The WVSSAC is a member of the National Federation of State High School Associations (hereafter "the Federation"), which has produced a document entitled "The Case for High School Activities." Said document argues for high school activity programs, such as interscholastic athletics, on the grounds that such activities "promote citizenship and sportsmanship ... instill a sense of pride in community, teach lifelong lessons of teamwork and self-discipline and facilitate the physical and emotional development of our nation's youth." Citing a number of studies and reports from professional journals, the Federation makes the following three key points in support of their position:

a. These activities "constitute an extension of a good educational program," noting that the students who engage in such activities "tend to have higher grade-point averages, better attendance records, lower dropout rates and fewer discipline problems than students generally."

b. They are "inherently educational" in that they "provide valuable lessons for practical situations—teamwork, sportsmanship, winning and losing, and hard work." The participants "learn self-discipline, build self-confidence and develop skills to handle competitive situations," all of which contributes to the development of "responsible adults and good citizens."

c. "Participation in high school activities is often a predictor of later success—in college, a career and becoming a contributing member of society."

47. The plaintiffs raise the following four issues:

a. By denying Aaron the right to participate in extracurricular activities, such as wrestling, the defendants are breaching Aaron's fundamental constitutional right to a thorough and efficient education and are further breaching their statutory duty to provide home schooling families with resources to assist in their home schooling efforts;

b. The defendants are violating the doctrine of unconstitutional conditions by conditioning access to a public right, benefit or privilege, i.e., participation in interscholastic athletics, upon relinquishment of the plaintiffs' constitutional right to home school their children;

c. The defendants' actions in barring home schooled children from participation in interscholastic athletics violates the principles of equal protection because there is neither a compelling reason nor a rational basis for such treatment. Further, the defendants violate their statutory and regulatory duty to afford every child in West Virginia equal educational opportunities and their regulatory duty to implement extracurricular programs in an equitable manner; and

d. The WVSSAC has breached its duty to promulgate reasonable rules and regulations, and apply same in a reasonable fashion, because the defendants attempt to justify barring home schooled students from interscholastic athletics primarily on the basis of maintaining academic standards. However, the defendants do not offer individual home schooled children the opportunity to demonstrate that their level of academic achievement is correlative to that of their public school counterparts.

**CONCLUSIONS OF LAW**

1. The statute that permits students to be home schooled, West Virginia Code section 18–8–1(c), neither explicitly nor implicitly grants home schooled students the right to participate in interscholastic sports. This does not conclude the inquiry.

68

## Fundamental Right

2. There is no dispute that the provisions of Article XII, Section 1 of the West Virginia Constitution afford West Virginia's children the right to a thorough and efficient education.

3. The plaintiffs are, in effect, asking this court to expand the scope of the constitutional right to a thorough and efficient education to include a right to participate in interscholastic sports. This cannot be done under current controlling law. Admittedly, the Supreme Court of Appeals of West Virginia (hereafter "West Virginia Supreme Court") has previously stated that a "thorough and efficient system of schools ... develops, as best the state of education expertise allows, the minds, bodies and social morality of its charges to prepare them for useful and happy occupations, recreation and citizenship, and does so economically." *Pauley v. Kelly*, 162 W.Va. 672, 255 S.E.2d 859, 877 (1979)(emphasis added). Subsequently, this definition was cited with approval in *Randolph County Board of Education v. Adams*, 196 W.Va. 9, 467 S.E.2d 150, 158 (1995). Participation in interscholastic sports certainly fosters some of the stated objectives of the State Board, such as the opportunity to develop "the ability to assess self and the total environment; ... to live a healthy lifestyle; the ability to participate in recreational activities; ... and a sense of responsibility to facilitate compatibility with others in society." West Virginia Code of State Regulations, Title 126, series 42, section 4.

4. Despite all of the foregoing the West Virginia Supreme Court has expressly ruled that "[p]articipation in nonacademic extracurricular activities, including interscholastic athletics, does not rise to the level of a fundamental or constitutional right under article XII, § 1 of the West Virginia Constitution." *Bailey v. Truby*, 174 W.Va. 8, 23, 321 S.E.2d 302, 318 (1984).

5. In light of the West Virginia Supreme Court's disposition of this issue in *Bailey*, the plaintiffs are unable to establish that Aaron has a fundamental constitutional right to participate in interscholastic sports.

## Resources for Home Schooling Families

6. The plaintiffs also argue that the wrestling program at Mannington Middle School is an available educational resource and that, by denying Aaron access to same, the defendants are breaching their statutory duty under West Virginia Code section 18–8–1(c)(3).

7. In pertinent part, West Virginia Code section 18–8–1(c)(3) requires the county superintendent to "offer such assistance, including textbooks, other teaching materials and available resources, as may assist the person or persons providing home instruction subject to their availability."

8. There is no dispute that participation in interscholastic athletics offers an individual student opportunities to learn important life lessons and expands the educational experience beyond the four walls of the traditional classroom. Therefore, it is arguable that the coaching and facilities that are available to a student athlete could be considered an available educational resource within the meaning of the aforementioned statute.

9. The view that coaching and facilities are an educational resource within the meaning of West Virginia Code section 18–8–1(c)(3) is supported by the fact that, as the plaintiffs correctly note, wrestling may provide Aaron with scholarship opportunities at the college level.

10. The defendants have breached their statutory duty under the above-quoted portion of West Virginia Code section 18–8–1(c)(3) by failing to make interscholastic sports available to Aaron.

## Doctrine of Unconstitutional Conditions

11. The plaintiffs claim that the defendants are conditioning access to a public right, benefit or privilege upon the plaintiffs' relinquishment of their fundamental constitutional right to control Aaron's education. In other words, they have been advised that the only way Aaron will be able to participate on the Mannington Mid-

dle School wrestling team is if they abandon their home schooling efforts and allow Aaron to enroll in Mannington Middle School as a full-time student.

12. The plaintiffs argue that restrictions on their right to home school Aaron must satisfy the compelling state interest test.

13. This argument overstates the case. Choices have consequences. The plaintiffs' have chosen to exercise the right to home school their children. A collateral consequence is that membership on a school wrestling team is not readily available to their son, Aaron.

14. Membership on a wrestling team is not analogous to rights such as entitlement to receive unemployment benefits. *Sherbert v. Verner,* 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963)(denying unemployment benefits where appellant could not work on Saturdays due to religious constraints improperly impinged on free exercise of appellant's religion). The court is unpersuaded that the cases relied upon by the plaintiffs are sufficiently on point to assist the plaintiffs in asserting the unconstitutional conditions doctrine, which is a questionable analytical tool in any event. *See, Dolan v. City of Tigard,* 512 U.S. 374, 407 n. 12, 114 S.Ct. 2309, 129 L.Ed.2d 304 (1994)(In which Justice Stevens, writing a dissent that was joined by Justices Blackmun and Ginsberg, correctly noted, in pertinent part, that although the doctrine has "a long history" it has "suffered from notoriously inconsistent application; it has never been an overarching principle of constitutional law that operates with equal force regardless of the nature of the rights and powers in question.")

15. The doctrine of unconstitutional conditions does not operate to invalidate the exclusion of home schooled children from interscholastic athletics.

### Rational Basis Test for the Equal Protection Claim

16. The plaintiffs claim that the exclusion of home schooled students from interscholastic sports teams, pursuant to WVSSAC Rule 127–2–3.1 violates the stu-

dents' equal protection rights under Article III, Sections 10 and 17 of the West Virginia Constitution. This is an issue that was left unresolved by the Supreme Court of Appeals of West Virginia (hereafter "West Virginia Supreme Court") in *Gallery v. West Virginia Secondary Schools Activities Comm'n,* 205 W.Va. 364, 518 S.E.2d 368 (1999).

17. As noted above, the West Virginia Supreme Court has specifically held that "[p]articipation in nonacademic extracurricular activities, including interscholastic athletics, does not rise to the level of a fundamental or constitutional right under article XII, § 1 of the West Virginia Constitution." *Bailey v. Truby,* 174 W.Va. 8, 23, 321 S.E.2d 302, 318 (1984).

18. Accordingly, the defendants are required to demonstrate only a rational basis for excluding home schooled students from participation in public school sports programs, not a compelling interest. *Bailey v. Truby, supra. See also, Harris v. West Virginia Secondary School Activities Comm'n,* 679 F.2d 881 (4th Cir.1982).

19. The defendants identify the following justifications, which they assert provide a rational basis for WVSSAC Rule 127–2–3.1 and the resultant exclusion of home schooled students from school-sponsored sports:

a. The State's interest in promoting academics over athletics;

b. Concerns over the ability of public school coaches and administrators to effectively maintain discipline with regard to home schooled students;

c. The State's interest in allocating scarce funding formula dollars; and

d. Considerations of school community and school spirit.

### Promoting Academics over Athletics

20. The defendants assert that the State's interest in promoting academics over sports is implemented through rules that make a student's eligibility for sports contingent upon achieving certain academic standards. They argue that the academic progress of a home schooled child

is only measured once a year and, as a result, the academic eligibility of home schooled students and public school students would be measured by a different yardsticks, to the potential detriment of the public school students.

21. As the plaintiffs correctly note, the defendants have not afforded any home schooled students the opportunity to demonstrate that their level of academic achievements are comparable to their public school counterparts.

22. The different yardsticks for measuring academic achievement have not prevented the successful involvement of home schooled students in public school bands.

23. Prioritizing academics over extracurricular sports is a legitimate State goal. However, the magnitude of the defendants' response to the perceived inequities in the measurement of academic eligibility between public school students and home schooled students is excessive. This court cannot conclude that the legitimate goal of prioritizing academics provides a rational basis for the total exclusion of home schooled students from interscholastic sports that results from WVSSAC Rule 127–2–3.1.

### Maintaining Discipline

24. In a similar vein, the defendants have expressed concern that the parents of some students with poor academic performance might withdraw those students from public school and begin home schooling them as a strategic ploy to maintain their athletic eligibility. This is a sad but probably realistic assessment that some parents may prioritize sports over academic progress.

25. While preventing such manipulation of the system may well be a legitimate objective, the court again concludes that this potential problem does not provide a rational basis for the blanket prohibition that currently keeps home schooled children out of school-sponsored sports.

26. As a corollary to their concerns about maintaining academic standards, the defendants also argue that there is no avenue for disciplining a home schooled student except on the playing field. Thus the defendants concede that there are, in fact, disciplinary mechanisms at their disposal with respect to home schooled students who engage in school sports.

27. There is nothing before this court that would suggest that permitting home schooled children to participate in school sports would undermine the ability of coaches or school officials to maintain discipline among public school students.

28. There is no evidence that participation by home schooled children in band activities has impaired the ability of band directors and school officials to maintain discipline over either the home schooled students or the public school students.

29. There is no evidence that Aaron's participation on the Mannington Middle School wrestling team caused disciplinary concerns.

30. Maintaining discipline may be a legitimate objective. However, as a factual matter there does not appear to be any rational basis for barring home schooled students from school sports where the defendants have conceded the existence of disciplinary mechanisms that could be applied to any home schooled student who joins a school team.

31. The exclusion of home schooled students that flows from WVSSAC Rule 127–2–3.1 fails the rational basis test and the court must conclude that the resultant distinction between public school students and home schooled students violates equal protection principles.

### Allocating Scarce Educational Dollars

32. The defendants claim that the State's interest in allocating scarce funding formula dollars provides a rational basis for the Board's, and the WVSSAC's, decision to bar home schooled students from athletic programs. They argue that every educational dollar spent represents hard choices in these difficult times and that every dollar spent on athletics is a dollar that is not available for academics and academic enrichment programs. They correctly note that athletic programs in-

volve, *inter alia*, costs for facilities, maintenance, coaches, officials, uniforms and equipment costs.

33. These assertions regarding the financial impact of athletic programs have no real bearing on the issue before this court because the financial commitment required of any school that offers an athletic program exists independently of whether there is any participation by home schooled students.

34. The defendants' stated concern with the cost of athletic programs provides an interesting and perhaps illuminating counterpoint to their assertions that the State's interest in promoting academics outweighs its interest in promoting athletics. While it is true that academics are, and should be, the primary mission of the State's educational system, it is also true that interscholastic sports are valuable and valued, as well. If this were not so, the money currently spent on school athletic programs each year would be devoted to more academically-oriented concerns.

35. The choice to expend limited educational dollars to develop and implement athletic programs in our public schools has already been made. The propriety of this choice is not at issue herein. However, it is disingenuous for the defendants to rationalize the exclusion of home schooled students from those programs on the basis of money.

36. The question to be answered is whether the defendants can point to a rational basis for this exclusion of home schooled children from the ongoing programs that the public schools have already decided to fund. There is no evidence before this court regarding increased costs, if any, that resulted from Aaron's participation on the Mannington Middle School wrestling team. Nor is there evidence of increased costs from the hypothetical involvement of a home schooled student on any other public school team. The financial impact of a home schooled child's involvement would be *de minimis*, at best (or worst).

37. By contrast, the plaintiffs established that 1) most, if not all, funding for interscholastic athletics is generated through ticket sales and other fund-raising activities in which home schooling families can participate, 2) the bulk of the expenses related to fielding an athletic team, such as the costs for the facilities and the salaries for the coaching staff, are fixed at the time a school decides to field a team and will not be increased by a home schooled child's participation, and 3) home schooling families, through their federal, state and local tax dollars, make the same contribution to public education in West Virginia as does any other West Virginia taxpayer.

38. Insuring the wise expenditure of educational dollars is clearly a legitimate governmental objective. However, there is no rational connection between this legitimate objective and the ban on home schooled students' involvement in interscholastic athletics.

39. Even if the defendants had established that there were additional costs incurred by the school system as the result of participation by home schooled children on a public school's sports team, this court would again conclude that the blanket prohibition is an excessive response and, as such, is not rationally related to the objective.

40. Similar financial concerns have not prevented home schooled students from participating in band, which is also an extracurricular activity. There was no evidence that the involvement of home schooled students in band has created any financial hardships for the schools sponsoring bands. Rather, the testimony of Mary Anne Hughes, a parent from New Martinsville whose home schooled children participated in Magnolia High School band, reflected that her family had been enthusiastic supporters of the band and its activities. They were band boosters, they raised money for the band, and they chaperoned band trips.

## School Spirit and Sense of Community

41. The defendants argue that considerations of school community and spirit provide a rational basis for the restriction of athletic programs. They assert that a

school's athletic programs serve not only to unify the members of its sports teams but also the whole student body. They also argue that a home schooled student has rejected membership in the school's student body and, as such, is not a logical representative of the school in athletic events.

42. There is no evidence that Aaron's participation on the Mannington Middle School wrestling team disrupted the school's sense of community. Nor is there any evidence that the student body or his teammates failed to be supportive of Aaron's efforts on the team's behalf.

43. The testimony adduced during the February 13 hearing gives rise to concern that the defendants' reluctance to open their sports programs to home schooled students reflects something of an insular attitude. Contrary to the defendants' assertion, the home schooled child has not rejected public education. Rather, children such as Aaron are being educated in the manner chosen by their parents and approved by the State through the appropriate county board of education. Closing the doors to their participation in sports further perpetuates the social isolation that is an obvious detriment to home schooling.

44. There is cause to question whether the defendants' refusal to embrace the participation of home schooled students in interscholastic athletics may flow, in some degree, either consciously or unconsciously, from the insular attitude that emerged from time to time during the course of the testimony on February 13. This gives rise to questions about whether terms such as "school spirit" and "sense of community" are merely socially acceptable terms that serve to disguise or legitimate this insular attitude.

45. In this context the court cannot conclude that the promotion of school spirit and sense of community constitutes a legitimate governmental objective.

46. Even if this were a legitimate objective in the context of this case, the court does not conclude that this provides a rational basis for excluding home schooled students from joining their public school counterparts in athletic competition. There is simply no evidence that a student body will not rally behind any member of a team wearing their school's uniform.

47. In this same vein, the defendants argue that schools rely upon members of athletic teams to provide role models and leaders for the student body. While this is a laudable sentiment it is not a legitimate governmental interest and does not provide a rational basis for excluding home schooled children from the benefits of team membership. In fact, recent history has shown us more than one example of a stellar West Virginia athlete whose behavior off the playing field has been, literally, criminal. There is nothing before this court that demonstrates that athletic prowess and leadership potential necessarily go hand in hand.

48. There is no dispute that home schooled students are allowed to participate in extracurricular band activities. There is no evidence that such participation has destroyed school spirit or disrupted the sense of community. The only cited difference between band and school sports, aside from participation *vel non* by home schooled students, is that the home schooled student must enroll in band class, which is considered an academic subject. The court finds that enrollment in a single class is a *de minimis* distinction that does not support treating home schooled students who want to participate in extracurricular sports differently from home schooled students who want to participate in extracurricular band. By extension, it does not support treating home schooled students who can qualify for participation on a school team differently from their public school counterparts.

### Reasonable Rules

49. The plaintiffs argue that the WVSSAC has breached both its duty to promulgate reasonable rules and regulations and its duty to apply the same in a reasonable fashion.

50. As an initial matter, the court will address the fact that the WVSSAC cites *Cape v. Tennessee Secondary School Ath-*

*letic Association,* 563 F.2d 793, 795 (6th Cir.1977),[4] for the proposition that the plaintiffs' "remedy, if any, should more appropriately be directed to activity within the framework of the association itself, a framework which is not shown to be inadequate to resolve issues of this sort." In this case, the framework of the WVSSAC has been shown to be inadequate to resolve the issues pending before this court. The plaintiffs are foreclosed from membership in the WVSSAC. Further, they were expressly advised that they were not entitled to bring Aaron's eligibility issue before the WVSSAC Board of Appeals. Therefore, the court rejects the WVSSAC's suggestion that 'the same philosophy [employed by in *Cape*] should be adopted here.'

51. The WVSSAC cautions this court against interfering in its internal affairs. Quoting from *Shelton v. N.C.A.A.,* 539 F.2d 1197, 1198 (9th Cir.1976), it further reminds the court " 'that it is not judicial business to tell a voluntary association how best to formulate or enforce its rules.' "

52. The *Shelton* Court employed the same rational basis test that is being brought to bear on the plaintiffs' equal protection claims in this case. *Shelton,* 539 F.2d at 1198 ("[W]e must examine the rule to determine whether it rationally furthers some legitimate purpose.")

53. As noted, under equal protection analysis, the draconian WVSSAC Rule 127–2–3.1 fails to *rationally* further some legitimate purpose.

54. As the WVSSAC has conceded, any presumption of validity that attaches to its rules and regulations must yield to a finding that a given rule violates constitutionally protected rights.

55. Even if the offending rule were deemed to be constitutional, the plaintiffs still urge that it is not a reasonable rule. In so arguing they rely upon *Hamilton v. Secondary Schools Activities Commission,* 182 W.Va. 158, 386 S.E.2d 656 (1989).

56. The *Hamilton* Court reviewed the WVSSAC's practice of determining a student's eligibility based on the number of

years of attendance. This rule is aimed at preventing the practice of "red-shirting" whereby a student is held back for a year to allow such student to develop and mature physically with an eye to improved athletic performance. The appellant in *Hamilton* had repeated ninth grade due to legitimate academic concerns. However, the WVSSAC refused to look behind the reasons for holding him back.

57. The *Hamilton* Court stated that "[w]hat makes the scheme unreasonable is the Commission's refusal to consider the circumstances surrounding a student's being held back. There is no inquiry into actual *intent* to red-shirt." *Hamilton,* 386 S.E.2d at 658. Noting that the appellant was challenging "the substantive reasonableness of the Commission's rule," the Court determined that, in the context of the appellant's case, the Commission's rule was "not within the Commission's legitimate authority to promulgate 'reasonable' regulations for school sports." *Hamilton,* 386 S.E.2d at 659.

58. As in *Hamilton,* the WVSSAC "has cast its net too wide." *Hamilton,* 386 S.E.2d at 658. The legitimate objectives of the WVSSAC could have been "accomplished in a more reasonable and less restrictive way." *Hamilton,* 386 S.E.2d at 659.

59. Therefore, the court must conclude that WVSSAC Rule 127–2–3.1 is not a reasonable regulation.

60. The plaintiffs also argue that the WVSSAC has created a number of exceptions to its own eligibility rules under which students may participate in athletics at a school they do not attend. The defendants acknowledge that there are certain exceptions but assert that the plaintiffs have overstated or misstated them. The court need not address the accuracy of the plaintiffs' assertions in this regard. Rather, it is sufficient for purposes of this analysis that the WVSSAC has been able to craft rules to meet circumstances where application of a blanket rule would be unfair. For example, exceptions from the

---

**4.** Although not identified as such by the WVSSAC, this is a very brief *per curiam* opinion

arising out of a challenge to the rules governing how female students played basketball.

attendance requirement are available to students at feeder schools where the feeder schools do not offer a particular sport. Title 127, series 2, section 3.2.1 of the West Virginia Code of State Regulations.

61. The significance of the foregoing is that it proves that the system has the inherent flexibility to deal fairly with exceptional circumstances. It emphasizes the fact that the total ban at issue herein is overkill. More finely tailored rules would meet the legitimate purposes this draconian ban is meant to serve.

## DECISION

For the reasons discussed above, the court concludes that 1) the defendants have breached their statutory duty under West Virginia Code section 18-8-1(c)(3) by failing to make an available educational resource available to Aaron, 2) the defendants have violated Aaron's right to equal protection, as guaranteed by Article III, section 10 of the West Virginia Constitution, because the blanket prohibition on home schooled students participating in interscholastic athletics fails the applicable rational basis test, and 3) the defendants have breached the duty to promulgate reasonable rules and regulations by implementing a total ban rather than crafting fair rules tailored to any legitimate concerns that may flow from allowing home schooled students, who are otherwise qualified, to participate on sports teams fielded by the public school they would be attending if they were not home schooled. Therefore, the defendants' policy of exclusion for home schooled children cannot continue. Each of the foregoing grounds provides an independent, distinct and alternative basis for ruling in favor of the plaintiffs.

The plaintiffs seek declaratory relief, injunctive relief and extraordinary relief in the form of writs of prohibition and mandamus. In light of the foregoing, it is hereby **ORDERED, ADJUDGED** and **DECREED** as follows:

1. Pursuant to West Virginia Code section 29A-4-2, a court may declare a rule invalid if it violates constitutional provisions or exceeds the statutory authority or jurisdiction of the agency or is arbitrary and capricious. Title 127, series 2, section 3.1 of the West Virginia Code of State Regulations is hereby declared invalid on any or all of the grounds that 1) it violates equal protection, 2) exceeds the statutory authority of the West Virginia Board of Education and the West Virginia Secondary Schools Activities Commission, and 3) is arbitrary and capricious in that it is overly broad.

2. The defendants are enjoined from violating the plaintiffs' statutory right of access to available educational resources, which includes participation on an existing school athletic team;

3. The defendants are enjoined from violating the equal protection provisions of the West Virginia Constitution by enforcing the enrollment rule that excludes home schooled students from interscholastic athletics;

4. The defendants are enjoined from failing and refusing to comply with their statutory duty to promulgate and enact reasonable rules for the regulation of interscholastic athletics;

5. A writ of prohibition is directed to the defendants to prevent them from exceeding their statutory and constitutional authority by excluding otherwise qualified home schooled students from participating on sports teams fielded by public schools;

6. The plaintiffs have met the three prerequisites for issuance of a writ of mandamus. Therefore, a writ of mandamus is issued

 a. to compel the defendants to comply with their statutory duty to afford the plaintiffs access to available educational resources, which includes participation in interscholastic athletics;

 b. to compel the defendants to afford the plaintiffs and their son the right to equal protection, as guaranteed by the West Virginia Constitution, which means that the defendants shall not give effect to the enrollment rule that

excludes home schooled students from interscholastic athletics;

c. to compel the defendants to comply with their statutory duty to promulgate reasonable rules, which shall not include an enrollment rule that results in the blanket prohibition against home schooled students participating in interscholastic athletics; and

d. to compel the defendants to allow the plaintiffs' son, Aaron, to try out for and, if successful, to compete on any sports team that is being fielded by the public school Aaron would otherwise attend were he not being home schooled.

The objection of any party aggrieved by entry of this order is noted and preserved.

The Clerk is hereby **DIRECTED** to forward an attested copy of this Order to all counsel of record, including counsel for the *amicus*. There being nothing further, this action shall be **DISMISSED** and removed from the docket of this court.

BENJAMIN, Justice, dissenting.

A sunny fall afternoon at a Marion County, West Virginia public middle school. The school football field. The school football team preparing to take the field. The school band in the stands urging on the home team. Fans cheering. A scene which plays itself out countless times each year across West Virginia.

Two similarly situated 13–year olds at the game. Both are the children of parents whose taxes help fund the public schools. Both children are non-publically schooled in full accordance with West Virginia law. Both are bright, athletic and hard-working children. One attends the local private religious school. The other is home-schooled. West Virginia permits both to be in the stands cheering. West Virginia permits both to be in the school band urging on the play-

ers and the crowd. West Virginia permits one 13–year old to take the field as a player. It forbids the other from doing the same. Different treatment? Yes. A bona fide rational basis for such different treatment? No.

That which fairness suggests, justice often requires. Facially neutral rules and procedures ought not result in the dissimilar treatment of similarly situated children. Sadly, the result in this case permits such a disparity in treatment and opportunity.

Daniel and Christy Jones, plaintiffs below and appellees herein, elected to home school their son Aaron, rather than send him to their local public middle school, Mannington Middle School in Marion County, West Virginia. In early 2002 when he was eleven years old, Aaron decided he would like to participate on the Mannington Middle School wrestling team. His parents contacted school officials who did not object to Aaron's participation so long as the West Virginia Secondary Schools Activities Commission ("WVSSAC") gave its approval. The WVSSAC, a voluntary organization, governs interscholastic athletics and band participation for its member schools. The WVSSAC refused to permit Aaron to participate on the wrestling team because he was not enrolled as a full-time student at Mannington Middle School as required by W. Va.C.S.R. § 127–2–3.1.[1] The WVSSAC likewise rejected the Jones' appeal of its decision because Aaron was not enrolled as a full-time student in a member school.

West Virginia requires all children to attend school between the ages of six and sixteen. W. Va.Code § 18–8–1(a). West Virginia permits compliance with the compulsory school attendance statute by a child's enrollment in a public school, a private school, a parochial school or other approved

---

1. The WVSSAC is a quasi-public body, established by W. Va.Code § 18–2–25, authorized to supervise and regulate "all interscholastic athletic events, and other extracurricular activities of the students in public secondary schools, and of said schools of their respective counties" upon delegation of such authority to the WVSSAC by the county board of education. The WVSSAC is likewise authorized to regulate and control interscholastic athletic events and other extracurricular activities of private and parochial secondary schools which delegate such authority to the WVSSAC. The WVSSAC's rules governing student eligibility to participate in interscholastic athletics are contained in Title 127, Series 2 of the Code of State Rules.

school.[2] W. Va.Code § 18-8-1(a) and (b). Additionally, West Virginia permits compliance where the child receives instruction in his or her home or other place, with the approval of the county school board and superintendent, subject to certain instruction and achievement requirements. W. Va.Code § 18-8-1(c). The person providing home school instruction must annually: (1) notify the county superintendent or board of his or her intent to home school a child; (2) present satisfactory evidence of possessing a high school diploma or equivalent; (3) outline a plan of instruction for the ensuing school year; and (4) obtain and submit to the county superintendent an academic assessment of the child for the previous school year by June 30 of each year.[3] W. Va.Code § 18-8-1(c)(2). Further,

> The county superintendent or a designee shall offer such assistance, including textbooks, other teaching materials and available resources, as may assist the person or persons providing home instruction subject to their availability. Any child receiving home instruction may upon approval of the county board exercise the option to attend any class offered by the county board as the person or persons providing home instruction may consider appropriate subject to normal registration and attendance requirements.

W. Va.Code § 18-8-1(c)(3).

There is no suggestion in the record before this Court that Aaron Jones has failed to meet any statutory requirement for home schooling. In fact, all indications are that he is a very good student, that he would likely excel academically if enrolled in a public school and that he enjoyed every minute of the brief period in which he was permitted to wrestle for Mannington Middle School by virtue of a circuit court injunction. There is no evidence whatsoever that he disrupted the team's dynamic or had difficulty getting along with his team mates.

As expressly sanctioned by West Virginia law, Aaron's parents have opted to privately school their child. They are in full compliance with West Virginia law governing provision of a non-public education; indeed, they are in as full compliance with applicable West Virginia law for the education of a child as the parents who send their children to the local public middle school and the local private religious school, Fairmont Catholic Grade School. This Court has previously found that public and parochial school students may rationally be treated differently in the allocation of state funds because they are not similarly situated as the parochial school student has rejected a free public education. *Janasiewicz v. Board of Educ. of Kanawha County,* 171 W.Va. 423, 426, 299 S.E.2d 34, 37–38 (1982). Were Aaron simply being treated differently than publically schooled students, I would agree with the majority in this matter. However, Aaron is being treated differently than other non-publically educated students in Marion County under the WVSSAC Rules. Where both educations are expressly sanctioned under West Virginia law as acceptable non-public educations, I can find no rational basis to treat those children enrolled in private or parochial schools in Marion County differently from those children being home-schooled in Marion County

**2.** Private schools, parochial schools, church schools or schools of a religious order are required to observe the minimum instruction terms applicable to public schools, maintain immunization and attendance records, and are subject to reasonable health, fire and safety inspections. W. Va.Code § 18-28-2. Students at these schools are required to be tested annually on the subjects of English, grammar, reading, social studies, science and mathematics until the age of sixteen. W. Va.Code § 18-28-3(a).

**3.** The annual assessment must be satisfied by (1) exceeding the fiftieth percentile on a nationally standardized achievement test in the subjects of reading, language mathematics, science and social studies or, if failing to meet the fiftieth percentile, showing improvement over the previous years results; (2) participating in the testing program currently in use in the public schools, at a public school and meeting the state testing program's current guidelines of acceptable progress; (3) providing the county superintendent with a narrative prepared by a certified teacher indicating a portfolio of samples of the child's work has been reviewed and that the child has demonstrated academic progress for the year in accordance with the child's abilities in the areas of reading, language, math and social studies; or (4) the child completes an alternative academic assessment of proficiency that is mutually agreed upon by parent or legal guardian and the county superintendent. W. Va.Code § 18-8-1(c)(2)(D).

so long as legitimate academic concerns can be met—as they easily can for both non-public school students.

There is no constitutional right to participate in public school athletics inherent in the law. *See Bailey v. Truby*, 174 W.Va. 8, 23, 321 S.E.2d 302, 318 (1984) (noting "[p]articipation in nonacademic extracurricular activities, including interscholastic athletics, does not rise to the level of a fundamental or constitutional right" under the West Virginia Constitution). *See, also, Hart v. National Collegiate Athletic Association*, 209 W.Va. 543, 550 S.E.2d 79 (2001). Thus, while the importance of participation for a home-schooled child in public school athletics requires scrutiny as a matter of common law, such participation "does not rise to the level of a fundamental or constitutional right under Article XII, § 1 of the West Virginia Constitution." *Bailey*, 174 W.Va. at 23, 321 S.E.2d at 318. Nor does it implicate a liberty interest. Participating in athletics is a privilege. Petitioners herein may, and should, develop appropriate rules and procedures to condition the exercise of this privilege so long as such rules and procedures have a rational basis. *Bailey, supra. See Harris v. West Virginia Secondary School Activities Comm'n.*, 679 F.2d 881 (4th Cir. 1982).

The ultimate issue herein is not whether a home-schooled child has a right to participate in public school athletics. It is instead whether one non-publically educated child has the right to the same treatment as another similarly situated non-publically educated child under the statutes, rules and procedures of this State. Whether the statutes, rules or procedures involve athletics or some other matter, justice requires that we not discriminate in favor of one child over another.

Here, without a compelling interest, much less a veritable rational basis, West Virginia has created a disparity in the treatment of such children by enacting rules which allow certain non-public school students to participate on public school athletic teams. *See Bailey, supra.* Under the WVSSAC "feeder school" rules, W. Va.C.S.R. § 127–2–3.2 [4], students enrolled in a non-public or private/parochial school, may participate on a public school team where the non-public or private/parochial school and the public school are both feeder schools to the same public high school. Thus, if a sixth grade student, such as Aaron, were enrolled in a parochial

---

4. W. Va.C.S.R. § 127–2–3.2 provides:

3.2. Students can participate only in schools in which they are enrolled; however, an exception may be granted by the Board of Directors as follows:

3.2.1. if a feeder school does not afford students the opportunity to participate and they are otherwise eligible.

3.2.2. for students from the WV Schools for the Deaf and the Blind (WVSD & B) to participate at Hampshire High School or Romney Middle School (only in sports not available at WVSD & B).

3.2.3. if member schools containing grades 6 and/or 7 and/or 8 and/or 9 may combine students from two or more schools within the county to form one interscholastic team in a sport. Requests for permission to combine students from two or more schools in the same non-public or public school system must be submitted annually to the West Virginia Secondary School Activities Commission (WVSSAC) in writing by the superintendent of the non-public or public school system. Schools which are combining to form one team must be feeder schools for the same high school and at least one school does not have sufficient numbers for a team.

If more than two schools are involved, principals are to evaluate the number of available participants in each school and shall combine schools to provide as many teams that sufficient numbers will allow. Sufficient numbers will be defined as the number of a starting line-up plus 50% (for odd number line-ups, round up).

3.2.4. Students enrolled in the ninth grade of a four, five or six year high school may participate on the high school team. Also, ninth graders of a feeder school may participate on their high school team and sixth grade students of a K–6 elementary feeder school may participate on their junior high team if granted permission by the county board of education or governing body of a private/parochial school and the school principals involved. Once a ninth grade student becomes a member of the high school team said student will be ineligible for the junior high team in that sport.

3.2.5. Students at a junior high or middle feeder school who are not provided the opportunity to participate because of age may move up to their high school if granted permission by the county board of education or governing body of a private/parochial school and the school principals involved.

school which opted into the WVSSAC and which is located in a county where there is no parochial high school which is also a WVSSAC member, West Virginia permits the parochial school student to play on the local public school athletic team. The only conditions necessary for the parochial school student to participate is that he or she maintain a requisite 2.00 grade point average and that the parochial school not field a team in the sport in which the student wishes to participate. In Marion County, a sixth grade student at Fairmont Catholic Grade School is eligible to compete on the Mannington Middle School's wrestling team—a privilege now denied to Aaron. West Virginia law provides to one non-publically educated student in Marion County what it denies to another.

West Virginia statutory law does not qualitatively distinguish between the non-public education of home schooling and the non-public education of enrolling in a private or parochial school. It is something which, subject to quality standards being met, provides West Virginians with a choice of education. Both non-publically educated students being similarly situated, and West Virginia having chosen to extend to one the privilege of competing, West Virginia must extend the same privilege to the other absent a clear and compelling rational basis not to do so. Otherwise, the majority has attached to the choice of education which this State gives to parents a penalty not otherwise provided by West Virginia law and, I think, not anticipated by the Legislature.[5]

The claimed rational bases set forth to this Court for denying a home-schooled student the same privilege to participate in middle school athletics as other non-publically educated children are unpersuasive. The argument that the enrollment requirement ensures academics standards are maintained for participation is a valid and important concern. It is however, not the enrollment which should justify the disparate treatment herein, but rather the ability or inability of Aaron to meet academic standards which should be a bona fide rational basis.[6] The mechanism used by the WVSSAC to ensure academic standards being met by an athlete, by its application, automatically excludes home-schooled children from participation, regardless of the actual academic ability of the child. In other words, it has more to do with arbitrarily treating similarly situated children differently than it does with ensuring a requisite educational level being maintained. W. Va.Code § 18–8–1(c)(2)(D) provides for objective bases, i.e., nationally standardized achievement tests, among other tests, to be used to access a home-schooled child's academic progress. Requiring a home-schooled athlete to take and obtain a certain score on such a test meets the important need for academic standards with little, if any, difficulty for the WVSSAC. Arguing, as the WVSSAC has done, that athletes with bad grades could avoid participation restrictions by opting for home-schooling is implausible and speculative. Such situations are easily subject to identification and exclusion just as they would be if the athlete instead opted to move from a public school to a parochial school. Adequate passing of the objective home school or public school test meets this restriction. Moreover, the argument that a home schooled child is not graded on a 4.00 scale fails to recognize that a 2.00 at the local public school may be, and probably is, different from the 2.00 at the local parochial school.[7] It is ironic that home-schooled chil-

5. The concept of home-schooling is one of controversy. That issue is not before this Court. The Legislature, being the appropriate forum to debate the pros and cons of home-schooling, has determined home-schooling to meet the educational requirements of West Virginia.

6. The record demonstrates that Aaron receives testing in each required subject every nine weeks. He has also participated in and successfully passed annual nationally standardized testing. Furthermore, the record demonstrates that, according to the expert testimony, Aaron's work could be given an grade equivalent to the 4.00 grade point formula by review of a public school teacher.

7. Likewise, the 2.00 grade point average standard cannot be realistically relied upon as an objective statewide standard unless the criteria which support the 2.00 grade point average are uniform from school to school. Absent a statewide test for athletes as a prerequisite to competing, which is apparently not preferred by the WVSSAC, the 2.00 grade point average requirement should not be erected as a bar to Aaron.

dren can participate in public school band activities even if they fail to satisfy the academic eligibility requirements set forth in Title 127, series 5, section 3.1 of the West Virginia Code of State Regulations. As noted by Judge Bloom below, these are the same requirements as the eligibility requirements for interscholastic athletics which are set forth at Title 127, series 2, section 6.1 of the West Virginia Code of State Regulations.

I also do not place credence in the purported rational basis for permitting participation by one Marion County non-publically educated student and not another under the so-called "feeder rule." This rule holds that the non-publically schooled students who are permitted to participate on the public middle school team will eventually be classmates with their public school teammates when they reach high school. As applied to individuals, it is speculative at best. There is no certainty that a Fairmont Catholic Grade School athlete participating on a public middle school athletic team will attend the same Marion County high school as his teammates. It is just as likely that the Fairmont Catholic Grade School athlete will continue his or her education at the Catholic high school in neighboring Harrison County, as there is no Catholic high school in Marion County for he or she to "feed" into. Absent more, a home schooled student and a student at Fairmont Catholic Grade School in Marion County may both be considered possible candidates for the public high school. Both non-public educations may constitute feeder possibilities for the public high school.[8]

There is also no rational basis that I can see for treating a home schooled child differently with respect to activities at the public school in which the home schooled child may participate. The home schooled child is permitted to enroll in band class at the local public school. As such, the home schooled child is also eligible to participate in the school's band and participate when the band plays at athletic events, concerts and competitions. The WVSSAC attempts to justify the distinction by arguing that band is a co-curricular, rather than an extra-curricular, activity. The argument goes that participation in band is linked to participation in a specific class offered by the public school. The basis of this argument is a distinction without a difference. Both the band and the athletic endeavors receive public funding, so obviously the decision has been made that both are of importance to the educational experience. Why distinguish between the two with respect to eligibility? What if the home-schooled student took a physical education class at the local public school? Neither the WVSSAC nor the State School Board have put forth a rational response to justify the purported distinction between co-curricular and extra-curricular activities in determining a home-schooled student's eligibility to participate.

Every argument raised by the WVSSAC as a basis for treating the two non-publically educated students differently fails to meet the requirement of being a bona fide rational basis for the different treatment of similarly situated children. They are pretexts. Neither non-publically educated student has an inherent right to play sports at the public middle school. However, where, as here, the State has chosen to extend to one non-publically educated student the privilege to play sports, it must do so for the other. Each child is entitled to equal protection and treatment under the rules and procedures applicable herein. The allowances and changes needed to effect this ability to play and uphold the principles which underlie the conditions for playing, such as academics, are easily met. The barriers relied upon by the State and accepted by the majority as rational bases to prevent an equal opportunity for both non-publically educated students focus unfortunately on inflexible procedures rather than the important policies which underlie

8. One might just as easily speculate that a home schooled student who plays athletics at the public middle school may be more likely to enroll at the public high school in order to continue his athletic eligibility once he or she surpasses the feeder school's maximum grade level since he or she has no other alternative which permits the athlete to continue both academics and sports.

them. I therefore dissent.[9]

9. While I agree with Justice Starcher's dissent that Judge Bloom's decision below is as learned as it is comprehensive, I cannot join my fellow Justice's dissent. I do not agree that the ability to participate in public school athletics rises to the level of "rights of children and parents."